AO 91 (Rev. 11/11) Criminal Complaint

AUSA Sunil R. Harjani (312) 353-9353

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RAYMOND WU

CASE NUMBER:
**UNDER SEAL**

**18CR      852**

MAGISTRATE JUDGE COX

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about August 2013 through in or about March 2018, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and for the purpose of executing such scheme, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals |

**FILED**

DEC 1 2 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

BRENT E. POTTER
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: December 12, 2018

*Judge's signature*

City and state: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT      )
                                      )
NORTHERN DISTRICT OF ILLINOIS    )

## **AFFIDAVIT**

I, Brent E. Potter, first being duly sworn under oath, hereby depose and state as follows:

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I am assigned to its Chicago Division. I have been employed by the FBI as a Special Agent for over 21 years, during which time I have conducted many financial fraud investigations and served numerous search and seizure warrants in such cases. I am currently assigned to an FBI squad dedicated to the investigation and prosecution of federal wire and mail fraud offenses, as well as related financial crimes.

2.     This affidavit is submitted in support of the attached criminal complaint and an application for the issuance of a search warrant for an email account. The information contained in this affidavit is based upon my personal knowledge, as well as information provided to me by other law enforcement officers. It is also based upon my review of subpoenaed records, records obtained without the use of a grand jury subpoena, and on information provided to me by non-law enforcement personnel. Because this affidavit is submitted for the limited purpose of establishing probable cause with regard to the attached criminal complaint and application for a search warrant, it does not set forth each and every fact that I have learned during this investigation.

3.     This affidavit is made for the limited purpose of establishing probable cause to support: (A) a criminal complaint alleging that, from in or about August 2013 and continuing through in or about March 2018, RAYMOND WU engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

1

promises and concealment of material facts, and for the purpose of executing such scheme, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, in violation of Title 18, United States Code, Section 1343 (wire fraud); and (B) an application for a warrant to search, pursuant to 18 United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), for information associated with e-mail account rwu@fivefoldequity.com (the "**Subject E-Mail Account**"), for evidence of violations of Title 18, United States Code, Section 1343.

## SUMMARY OF THE OFFENSE

4.      As explained in more detail below, there is probable cause to believe that WU engaged in a scheme to defraud Victims A and B.

5.      Victim A is a resident of Chicago, Illinois and wired funds from the Northern District of Illinois to bank accounts controlled by WU.   There is probable cause to believe that WU represented to Victim A that he would use Victim A's funds solely to make equity investments in a number of start-up companies with which he claimed to be affiliated.   Victim B is a resident of Brownsburg, Indiana.  WU represented to Victim B that he would use Victim B's funds to arrange for patents and technology development in connection with a start-up business concept. In fact, WU did neither of those things.   Instead, there is probable cause to believe that WU stole the majority of funds paid to him by Victims A and B between August 2013 and March 2018 and converted the funds to his own personal benefit.   To date, the financial loss suffered by Victims A and B is approximately $450,000.

6.      Moreover, as discussed below, WU was under the supervision of the United States District Court for the Eastern District of Wisconsin and the Central District of California during

2

the time that he engaged in the fraud scheme described herein against Victims A and B. WU was on supervised release stemming from his conviction for a violation of Title 18, United States Code, Section 1343 (wire fraud) in a prior case that was unrelated to the fraud against Victims A and B. WU was sentenced to approximately one year in prison for his crime, ordered to pay approximately $242,000 in restitution payments to a victim, and Court supervision for three years after his release from incarceration.

7.       Furthermore, as discussed below, while incarcerated by the Federal Bureau of Prisons at a halfway house, WU utilized the **Subject E-Mail Account** to deceive Victim A into believing that WU was traveling to remote regions of the world for investment purposes instead of serving federal prison time for fraud. There is probable cause to believe that, in the same e-mail exchange and using the **Subject E-Mail Account**, WU falsely claimed that he would transfer Victim A's equity investment into another investment vehicle. By that time, however, WU had spent the majority of Victim A's funds on WU's personal expenses years before.

8.       As discussed below, there is probable cause to believe that WU began defrauding Victim B very shortly after WU's guilty plea in U.S. District Court for the Eastern District of Wisconsin to federal wire fraud charges in April 2016. There is probable cause to believe that WU continued to defraud Victim B while serving his prison term in a halfway house, as well as while under Court supervision after his release from prison. WU facilitated his fraud against Victim B, even while incarcerated, through his use of the **Subject E-Mail Account** to send fraudulent billing summaries and requests for more funds to Victim B.

3

## FACTS ESTABLISHING PROBABLE CAUSE

### Five Fold Equity Partners

9.      According to publicly-available records, Five Fold Equity Partners LLC ("Five Fold Equity") is an active corporate entity that was incorporated in the state of Nevada in January 2012.   In his e-mailed communications to Victim A, which I have reviewed, WU has identified himself as the "Chairman of Board" and "Founding Partner" of the company.   Five Fold also has a website, www.fivefoldequity.com, that appears to represent the company.   The website has only a password-protected "client portal" and a page to submit contact information for inquiries.   The FBI has also identified three bank accounts, described below, that are associated with Five Fold Equity.   The signers on those three bank accounts are WU and his mother.

### Timing of WU's Incarceration and Supervised Release

10.      WU was arrested at Los Angeles International Airport by the FBI pursuant to an arrest warrant originating in the Eastern District of Wisconsin on or about May 24, 2015, in connection with his part in a fraud scheme.   At the time of his arrest, WU was returning to the United States from Cancun, Mexico, in the company of Girlfriend A, who I believe to be WU's girlfriend.   WU subsequently was granted pre-trial release at a detention hearing in United States District Court for the Central District of California.   During the hearing, WU was specifically ordered by the Court to refrain from any future violations of state, federal or local laws while on pre-trial release.   WU was released on a $25,000 surety bond signed by Girlfriend A.   According to a law enforcement officer with whom I have spoken, who interacted with WU in 2018, WU currently lives with Girlfriend A at a residence in Playa Del Rey, California.

11.      WU subsequently entered a guilty plea in that case to a single count of a violation

4

of Title 18, United States Code, Section 1343 (wire fraud) on or about April 11, 2016 in the United States District Court for the Eastern District of Wisconsin. WU was subsequently sentenced to one year and one day in federal prison on or about December 5, 2016, to pay restitution of over $242,000, and to a three-year term of supervised release following incarceration. WU began serving his prison sentence on or about January 31, 2017 at the Federal Correctional Institution ("FCI") located in Taft, California. WU completed his prison sentence at FCI Taft on or about September 14, 2017 and transferred to a halfway house facility in Los Angeles. The halfway house was under contract with the BOP to house federal inmates, such as WU, who were serving the last phase of their custodial sentence. WU continued to serve the remainder of his one-year sentence at the halfway house until December 12, 2017, when he was discharged from the custody of the BOP at the completion of his federal prison sentence. According to WU's BOP records, WU was credited with some time-off from his original sentence by the BOP for good behavior while incarcerated. WU's three years of supervised release under the jurisdiction of the United States District Court for the Central District of California is scheduled to extend through approximately December 2020.

12.     While incarcerated at the halfway house, WU was able to leave the facility on some days to work, but he was required to be back in the facility every night and to spend the night there. WU lived at the halfway house from approximately September 14, 2017 through the completion of his custodial sentence on approximately December 12, 2017.

### Information Obtained from Victim A

13.     The FBI initiated the current fraud investigation of WU in or about August 2017, based upon a complaint to the FBI by Victim A. I interviewed Victim A, a resident of Chicago,

5

Illinois, on or about April 19, 2018. Victim A provided me with documents given to him/her by WU, as well as e-mail exchanges between WU and Victim A. Victim A told me that he/she struck up a friendship with WU in or around 2006 based upon their mutual interest in poker. Victim A and WU often met up and gambled together in Las Vegas over the next several years. WU told Victim A that he was affiliated with a number of start-up ventures and that he ran his own investment firm, which he identified as Five Fold Equity. WU described the start-ups with which he was affiliated as technology/Internet based services. According to Victim A, WU identified the names of the start-up ventures as Gift From George, VerifyMe, and SocialSearch. WU told Victim A that he could offer him/her an investment opportunity in the start-up ventures through his company, Five Fold Equity. WU also told Victim A that he/she could send investment funds to WU and that WU would make investments on Victim A's behalf in these companies. Moreover, according to Victim A, WU told Victim A that his/her investments would be safe, and that WU would help cover any losses stemming from the investments.

14. According to Victim A, Victim A trusted WU due to their longstanding personal friendship, and he/she made a series of wire transfers to Bank of America accounts controlled by WU, beginning in approximately August 2013 and continuing through approximately October 2014. In addition, Victim A wired $75,000 to a Bank of America account in the name of Gift From George LLC at WU's direction in or around October 2013. WU was not a signer on the Gift From George account but, within two months, over $64,000 of Victim A's funds were transferred to one of WU's personal bank accounts. In all, Victim A paid approximately $250,000 to Five Fold Equity and Gift From George for the purpose of making investments in the start-up companies that WU had described to him/her.

6

15.     According to Victim A, WU did not tell Victim A that he would use any of those funds for his own personal or business expenses.   WU represented that these funds would be used solely for the purpose of purchasing equity investments for Victim A.

16.     In or around January 2017, WU told Victim A that he would be going on a year-long worldwide trip with investors associated with Warren Buffett.   According to Victim A, WU stated that he planned to be primarily in undeveloped areas without internet or cell phone service, and that he anticipated being difficult to contact for this reason.   WU told Victim A that the purpose of the trip was to become involved in investment opportunities in remote regions of Asia. In reality, WU was scheduled to begin serving his one year and one day federal prison sentence later that month.   WU did not tell Victim A that he was going to prison for defrauding an investor. Instead, there is probable cause to believe that WU lied to Victim A and said that he would be instead be touring remote regions of the globe in search of lucrative investment opportunities, from which Victim A might presumably benefit.

17.     Victim A e-mailed WU at the **Subject E-Mail Address** on or about June 15, 2017 and stated, "Ray, I hope that your prolonged international travels went well … As you know, all of my liquid cash was invested in GFG, SocialSearch and VerifyMe.   You have always mentioned that you would help cover any losses in these investments.   I am thinking that it is now time to invest in something that I will have a larger direct role in."   WU responded on or about October 13, 2017 using the **Subject E-Mail Address**, writing "I've missed you my good friend!   Making my way back stateside.   Travels were amazing.   Very interesting opportunities and very interesting people.   I will need a few weeks to become situated but we must catch up.   Yes, in regards to below.   I will assess the way to conduct the transfer.   My committment (sp) to you is

7

good.   We will keep going until we reach success."

18.      In reality, WU was not, in his words, "making my way back stateside."   He was incarcerated in a Los Angeles halfway house in BOP custody.   WU also lied to Victim A when he stated that he would "assess the way to conduct the transfer."   WU had spent Victim A's investment funds on WU's own personal expenses years before, as further described below, and there were no funds remaining to transfer.

19.      I have spoken with Individual B, a BOP Residential Reentry Manager involved in the supervision of the halfway house to which WU was assigned.   Individual B told me that WU would have been able to leave the halfway house during the day to work and that WU likely had access to the **Subject E-Mail Account** through a computer at the halfway house or while WU was out of the facility during the day.

20.      To date, according to Victim A, he/she has lost approximately $200,000 from his/her investment with WU

### Information Obtained from Victim B

21.      I conducted an interview with Victim B, a resident of Brownsburg, Indiana, on or about October 1, 2018.   Victim B gave me copies of documents that WU had provided to him/her. According to Victim B, he/she and WU have a longstanding personal friendship that dates back to their attendance at high school and college together.   Victim B approached WU by phone with a concept for a new technology-based start-up business in or around the summer of 2016.   WU subsequently agreed to assist with the venture and said that he would apply for patents to protect Victim B's intellectual property, provide a valuation for the start-up, and consult with experts to begin developing the technology.   WU said that he had the network and contacts to accomplish

these tasks, but he needed funds from Victim B and his/her spouse to get the work started. According to Victim B, Victim B and WU agreed that Victim B would wire funds to WU in "phases" as they were needed for the project. WU told Victim B that he would only use these funds for the purposes set forth above. WU did not tell Victim B that he would use any of Victim B's money to pay his own personal or business expenses, or give the money to individuals unrelated to the project.

22.     According to Victim B, WU, Victim B and Victim B's spouse signed a "Teaming Agreement" on or about July 1, 2016. WU signed the agreement as the "Managing Partner" of Five Fold Equity. The agreement, which I have reviewed, stated that Five Fold Equity would provide Victim B and spouse with "business management services to build a business model, branding initiative, marketing strategy and a mobile application to promote the industry and marketplace awareness of Concept."

23.     According to Victim B, he/she began to wire periodic payments of $25,000 or $50,000 each to a Bank of America account in the name of Five Fold Equity for the project in or about July 2016 through September 2018. According to Victim B, he/she sent these funds whenever WU, using the **Subject E-Mail Account**, directed him/her to send more money to fund the project. In all, Victim B and his/her spouse have wired $250,000 to WU through the Five Fold Equity account.

24.     WU, using the **Subject E-Mail Account**, sent six one-page "Wire Transfer Instructions" to Victim B from October 2017 through October 2018. Each such document bore the same logo as the website of Five Fold Equity, and each one directed Victim B to wire funds to a Bank of America account for credit to Five Fold Equity. The Wire Transfer Instructions all

9

referenced the Teaming Agreement described above. The most recent Wire Transfer Instructions received by Victim B, which was dated October 18, 2018, noted that $250,000 has been paid to date by Victim B to Five Fold Equity.

25.     According to Victim B, WU has told Victim B through telephone conversations that the patent applications are in progress and that he has technology developers working on the project. WU has not identified the patent attorneys or developers to Victim B, and Victim B has not spoken about the project to any of these individuals, only WU. Moreover, during approximately early 2017, WU told Victim B that he would be traveling on business for a period of at least several months during 2017 and that he would have limited access to telephone or internet service. WU did not tell Victim B that he was actually going to federal prison for more than a year.

26.     To date, Victim B and Victim B's spouse have collectively lost $250,000 from their investment with WU.

### Preliminary Financial Analysis

27.     As part of the FBI's investigation of WU, I have obtained records from Bank of America for three of WU's personal checking accounts and three business checking accounts in the name of Five Fold Equity. WU was the sole signer on all three of his personal checking accounts and both WU and his mother were the signers on all three of the Five Fold Equity accounts. Neither Victim A nor Victim B dealt with WU's mother with regard to their payments to WU or their business dealings with WU. WU's business and personal checking accounts were collectively active from 2011 through 2018. I have also obtained records from Bank of America concerning three business checking accounts held by Gift From George LLC. WU was not a

10

signer on any of the Gift From George LLC accounts, but the accounts received investor funds. All of the bank records outlined above have been analyzed by an FBI Forensic Accountant and I have examined the results of the analysis.

28.     The records show that Victim A made five wire transfers of funds to Bank of America accounts in the name of Five Fold Equity from approximately August 2013 through October 2014, totaling $175,000.  In addition, Victim A wired $75,000 to a Bank of America account in the name of Gift From George LLC on or about October 1, 2013.   WU was not a signer on the Gift From George LLC account.   Nonetheless, WU received over $64,000 in transfers to one of his personal bank accounts from the Gift From George LLC account over the following two months.  WU repaid approximately $50,000 to Victim A between November 2014 and April 2016.

29.     According to the bank records, WU used the majority of the funds that Victim A wired to Five Fold Equity to pay his personal expenses.   For example, Victim A wired $50,000 to Bank of America account ending in 7816, owned by Five Fold Equity, on or about March 25, 2014. Prior to this incoming wire, the account held a negative balance in excess of $4,000 and there were no other significant deposits to the account over the course of the next month.   Over the course of the following month, WU withdrew $5,000 in cash, transferred over $8,000 to one of his personal bank accounts, paid over $8,200 towards his American Express bill, and made $1,000 in ATM withdrawals in Las Vegas, Nevada.   Bank records show that WU spent the funds transferred to his personal bank accounts on personal expenses and rent payments.   In addition, WU made a point of sale purchase at the Aria Resort Las Vegas for over $3,100; another at the Mandalay Bay casino in Las Vegas for over $5,200; charged nearly a thousand dollars at restaurants; and charged

over $1,000 for air travel. By April 28, 2014, WU had depleted the account balance, which consisted entirely of Victim A's money, to less than $5,000. Based on the records obtained, there is probable cause to believe that all of WU's purchases using Victim A's money during that time were personal in nature. Moreover, the records do not show that WU made any investments on behalf of Victim A with this money.

30.     Bank records show that Victim A wired another payment of $50,000 to the same account on or about April 29, 2014. There were no other deposits to the account from the time of Victim A's payment of $50,000 on or about March 25, 2014, as noted above. WU then proceeded to spend over $8,000 on his American Express bill; transferred $17,500 to one of his personal bank accounts; withdrew $19,400 in cash; and purchased $1,000 worth of tickets for air travel. By approximately June 13, 2014, the bank records show that less than $260 of Victim A's funds remained. Among the things on which WU spent the funds transferred to his personal account were rent, casino expenses, a $5,000 cash withdrawal and a $3,000 payment to Individual C with regard to a personal debt which is explained further in paragraph 34. There is probable cause to believe that all of Victim A's funds, including those that WU transferred to his personal bank account, were spent on personal expenses by WU in approximately three months. Again, the bank records show that WU did not use any of Victim A's funds to make investments on Victim A's behalf.

31.     The records also show that Victim B made approximately $200,000 in wire transfers to Bank of America accounts controlled by WU from July 2016 through March 2018. There were no instances of repayment to Victim B by WU. For example, Victim B and his/her spouse wired their first payment of $50,000 on or about July 5, 2016 to Bank of America account

ending in 9608, owned by Five Fold Equity. Prior to the deposit of Victim B's funds, the account balance was less than $1,100. Over the course of the next month, WU transferred $22,000 to one of his personal bank accounts; paid $10,000 to Girlfriend A; made $1,300 in ATM withdrawals; and made a payment of approximately $1,390 to BMW Financial Services. The $22,000 sent to his personal bank account were spent on personal expenses, including an $11,000 payment to Individual C toward the payment of a personal debt as explained further in paragraph 34 below; the purchase of a $2,000 stake in future potential winnings of a professional poker player; a payment of $1,350 to WU's mother; and $1,000 paid to Girlfriend A. No other significant deposits were made to the account during that time frame. There is probable cause to believe that the funds that WU transferred to his personal bank account were used to pay WU's personal expenses.

32.     Victim B and his/her spouse wired another $25,000 to the same account on or about October 17, 2017, while WU was still serving his federal prison sentence at the California halfway house. The balance of the account was under $1,400 prior to the deposit of Victim B's funds and there were no other deposits during the time frame in question. Over the course of the next week or so, WU transferred $6,500 to one of his personal bank accounts, paid $8,000 to Girlfriend A, withdrew $500 in cash and made a point of sale purchase of $845 at Costco. Victim B's spouse wired another $25,000 to the same account on or about November 14, 2017, again while WU was still incarcerated at the halfway house. There were no other significant deposits to the account during this time frame. Over the course of the following week, WU transferred $12,000 to his personal account, paid $6,000 to Girlfriend A and withdrew $2,500 in cash. WU also transferred $9,500 to a business bank account on which Girlfriend A is a signer. WU used the funds

13

transferred to his personal account to make $11,000 in payments to Individual C in connection with a personal debt; paid $1,350 to his mother; paid $1,000 to Girlfriend A and made payments towards other personal expenses, such as storage unit fees and restaurant expenses.

33.     Victim B and his/her spouse wired another $50,000 to the same account on or about March 14, 2018.   The balance of the account prior to this deposit was less than $1,800. According to the bank records, there were no other deposits to the account during the time period in question.   Over the next several days, WU transferred $12,500 to one of his personal bank accounts, transferred $18,000 to his girlfriend and another $18,000 to a corporate entity affiliated with Girlfriend A and paid over $2,900 in entertainment related expenses.   WU used the funds that he transferred to his personal bank account to make $11,000 in payments to Individual C in relation to a personal debt, and paid $1,350 to his mother.    The bank records do not show business-related expenses paid by WU during this time.

### WU's Personal Debt to Individual C

34.     I interviewed Individual C, a retired dentist and resident of Glencoe, Illinois, on or about December 7, 2018.   WU is a member of Individual C's family through marriage. Individual C extended a $200,000 personal loan to WU at WU's request in 2009.   Although WU told Individual C that he would repay the loan within three months, WU did not begin repayment of the loan until years later.   WU has continued to pay approximately $5,500 per month to Individual C through 2018.   Individual C also invested $200,000 with WU, beginning in 2009, and has seen no returns on this investment.   Beyond extending the personal loan and investment capital to WU, Individual C has performed no services related to WU's business.

14

**Use of Interstate Wires**

35.     Victim A, a Chicago resident, caused to be sent a wire transfer, via Fedwire, in the amount of $50,000 from his Charles Schwab brokerage account to Bank of America account ending in 7816, in the name of Five Fold Equity, on or about March 25, 2014 in order to invest with WU.  Fedwire is an electronic interbank funds transfer system operated by the Federal Reserve System.

36.     Based upon my training and experience, and upon interviews conducted by FBI Special Agents of Federal Reserve System employees in prior investigations, I know that Fedwire does not process wire transfers in Illinois but rather in New Jersey and/or Texas.   Thus, Fedwire transfers initiated in Illinois are interstate wire transactions.

**The Subject E-Mail Account**

**A.     Google**

37.     Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google and Gmail:

38.     Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

39.     Google maintains electronic records pertaining to the individuals and entities who

15

maintain Google online subscriber accounts. These records often include account access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

40.     Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

41.     When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

42.     Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

43.     Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

44.     Google keeps records that can reveal accounts accessed from the same electronic

device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

45.     Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google, such as account access information, transaction information, and account application.

**B.     Search Procedure**

46.     In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

47.     The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A;

48.     In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein;

49.     Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

17

50. Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

### C. Subject Email Account

51. The **Subject E-Mail Account** is stored at premises owned, maintained, controlled, or operated by Google LLC, an e-mail and domain name registration provider located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

52. On or about November 21, 2018, I sent a preservation request to Google requesting the preservation for 90 days of all account contents for the **Subject E-Mail Account.** Google subsequently provided a response indicating that they received the preservation request. Based upon subpoenaed records that I subsequently received from Google, the **Subject E-Mail Account** was established by WU on or about April 6, 2012. The access log for the Subject E-Mail Account shows that it was recently accessed in September 2018 within less than four miles of WU's residence in Playa Del Rey, California. In addition, the telephone number provided for WU in Google records associated with the **Subject E-Mail Account** is the telephone number that he is currently using to communicate with Individual C.

53. As described above, WU used the **Subject E-Mail Account** to communicate with Victims A and B during the scheme. Based on my training and experience in fraud investigations, and on my review of e-mails sent from and received by the **Subject E-Mail Account**, I believe that a search of the e-mail contents of the **Subject E-Mail Account** will likely yield investigative leads relating to fraudulent representations made by WU to his investor victims. Based on my

training and experience, I have found that individuals engaged in this type of fraud scheme often retain e-mails in their in-box or sent items for many months or even years.

## CONCLUSION

54. Based upon the information set forth above, I respectfully submit that there is probable cause to believe that, beginning in or about August 2013 and continuing through at least in or about March 2018, WU engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and concealment of material facts, and, for the purpose of executing such scheme, caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, specifically a Fedwire funds transfer from the Charles Schwab account of Victim A to a Bank of America account ending in 7816, whose sole signer is WU, in the amount of $50,000 on or about March 25, 2014, in violation of Title 18, United States Code, Section 1343.

55. In addition, I respectfully submit that there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 1343 are located within one or more computers and/or servers found at Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043. By this affidavit and application, I respectfully request that the Court issue a search warrant directed to Google allowing agents to seize the electronic evidence

and other information stored on the Google servers following the search procedure described in

Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.

Brent E. Potter
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 12th day of December 2018, at Chicago, Illinois.

The Honorable Susan E. Cox
United States Magistrate Judge
Northern District of Illinois

20