UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RAYMOND WU

No. 18 CR 852

Rebecca R. Pallmeyer

## MOTION TO CONTINUE DETAINING DEFENDANT WU

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully requests that the Court detain defendant Raymond Wu as a flight risk and danger to the community, for the reasons set forth below.

### Background

On December 18, 2018, defendant Raymond Wu was arrested in California based on an arrest warrant, and complaint, issued in Chicago. On February 12, 2019, the grand jury returned an indictment charging Wu with four counts of wire fraud.

**Defendant was Detained:** After Wu was arrested in California, the Magistrate Judge held a detention hearing and ordered that Wu be permanently detained. A transcript of the Detention hearing is attached. See Detention Hearing. The Magistrate Judge issued a Detention Order finding that Wu presented a risk of flight and a danger to the community. The Detention Order is attached. See Detention Order.

In the Detention Order, the Magistrate Judge stated that, as to flight risk:

1

- "Current charges were committed while on SR [Supervised Release] for a prior similar offense";

- "[Defendant] had extensive foreign travel history that was not revealed to Pretrial Services"; and

- "[Defendant] told probation officer in prior case that he had to travel internationally for his job".

The Magistrate Judge stated that, as to danger to the community:

- "Alleged offense conduct committed while on SR [Supervised Release] for a prior similar conviction";

- "[Defendant] gave false statements to Pretrial [Services Officer]"; and

- "[It] would be very difficult to monitor computer usage, his vehicle for committing fraud crimes."  See Detention Order p.3.

### **Wu Should Continue to Be Detained**

Wu lied to Pretrial Services, violated his conditions of Supervised Release, recently contacted an investor, failed to pay ordered restitution, previously committed a serious fraud, failed to show remorse in that case, and failed to file tax returns for seven years.  The defendant presents a risk of flight and a danger to the community, and there are no combination of conditions that will prevent flight or protect the community.

The indictment in this case alleges that between 2009 and December 2018, Wu engaged in a scheme to defraud investors and lenders ("investors"), through false representations, which resulted in a loss of approximately $1.4 million.   Two charts are attached relating to the funds that Wu obtained from investors.  See Investor Chart and Timeline Chart (with investors' names redacted).  The Investor Chart shows the total

2

amount of funds that Wu raised.  The Timeline Chart shows the dates of investments, and identifies dates relating to the Milwaukee case.[1]

## **Wu Lied to Pretrial Services**

**Foreign Travel**:  As described above, Wu falsely represented to the Pretrial Services Officer that he travelled outside of the U.S. on only one occasion.  In fact, Wu travelled to foreign countries on eight other occasions over a three-year period, from 2012 to 2015.  A list of his trips produced by the U.S. Customs and Border Protection is attached. See Travel Record (with handwritten notes identifying the countries, and numbering the trips).  Specifically, the Travel Record shows the following trips:

|   | Departure Date | Foreign Country |
|---|---|---|
| 1 | 1/21/2012 | Australia |
| 2 | 5/21/2013 | Mexico |
| 3 | 12/9/2013 | Mexico |
| 4 | 12/21/2013 | Haiti |
| 5 | 2/10/2014 | Mexico |
| 6 | 11/2/2014 | Taiwan |
| 7 | 12/6/2014 | Haiti |
| 8 | 1/3/2015 | Mexico |
| 9 | 5/16/205 | Mexico |

---

1 Both charts are draft charts.  The information contained in those charts are based on the information currently known to the FBI, and that information may change.  The Timeline Chart does not include all of the investments.

**Wu Lied about his Employment in 2018:** Wu lied to Pretrial Services (and Probation) about his employment during 2018. Wu told Pretrial Services and Probation that he was employed by Koi Shi Catering for a year (2018), and that he earned $4,000 a month.2 According to Probation Officer Aleese Williams, Wu provided information to Probation on a monthly basis.

Wu told Probation that he started working for Koi Shi Catering in October 2017, and continued working there through November 2018. He reported that he worked 40 hours a week and that he earned $4,000 a month. Wu submitted his last report to Probation in December 2018, showing that he had worked for Koi Shi Catering in November 2018.

According to the Probation Officer, Wu provided the address of the company, and the name of his supervisor, Yuki Kamata, as well as the company's phone number.

On February 19, 2019, the FBI case agent, Special FBI Agent Brent Potter, contacted the individual identified by Wu as his supervisor, Yuki Kamata, at the phone number that Wu provided to Probation. The FBI agent summarized his conversation with Yuki Kamata as follows:

"I spoke by phone today with YUKIHIRO KAMATA, 818-568-0483, who was listed on the paperwork with the U.S. Probation Office for the Central District of California as WU's supervisor at KOI SHI CATERING. In summary, KAMATA said that he met RAYMOND WU through his prior business partner, who had been

---

2 The Pretrial Services report spelled the company name as Koi Sho (instead of Koi Shi).

in jail.  KAMATA knew that WU had been in jail.  WU told KAMATA that he needed to list an employer on his paperwork with the court to show that he had a job, and he asked to use the name of KAMATA's company.  KAMATA's company is a Nevada corporation, KOI SHI ENTERPRISES.  **WU never worked as an employee for KAMATA or KOI SHI ENTERPRISES, and he never earned any pay from KAMATA or KOI SHI ENTERPRISES**."  [Emphasis added].

Also, according to FBI Agent Potter, a review of Wu's bank records shows that there were no deposits in Wu's personal or business bank accounts from Koi Shi Catering (or Koi Sho Caterining) through November 2018.  Thus, it appears that Wu lied to Pretrial Services and to Probation when he said that he worked for Koi Shi Catering (or Koi Sho Catering) during 2018, earning $4,000 a month.

**Employment History 2015-2016:**  Wu also lied to Pretrial Services about his employment history at Sponsor Shipping during the time period 2015 to 2016.   He also lied about when he worked as a "self-employed consultant."

According to the Pretrial Services Report, Wu stated that he worked as a manager at Koi Sho Catering for the last year (which would be 2018).  Report at 3.  He stated that, prior to working there, he was unemployed and in prison. (which would be 2017).  *Id.*

According to the Pretrial Services Report, Wu "stated that he previously worked for Sponsor Shipping for two years [which would be 2015-2016], and was a self-employed consultant for five years [which would be 2011-2016]."

Wu lied to Pretrial Services when he said that he was working for Sponsor Shipping during 2015-2016. When Wu entered his guilty plea on April 11, 2016, Wu stated that he had not worked for 3½ years, and was unemployed at that time. According to Wu, he was not working during 2015 or the first part of 2016. The following colloquy took place:

> The Court: Okay. You're currently working, is that right?
> The Defendant: No.
> The Court: You're not working? Okay. When's the last time that you were employed?
> The Defendant: This – it would be a few years ago, I guess.
> The Court: Okay. Couple? Four or five?
> The Defendant: Three and a half.
> The Court: Three and a half.

Plea Transcript at 4.[3]   Given Wu's testimony that he was unemployed in 2015 and part of 2016, his statement to Pretrial Services was not true.

Wu's statement to Pretrial Services about working for Sponsor Shipping was not simply a mistake. Wu told Pretrial Services that he worked for Sponsor Shipping for two years. That was not true. In December 2016, Wu submitted a sworn Financial Statement to the Milwaukee U.S. Attorney's Office, which is attached. See Financial Statement (redacted). In that Statement, Wu said that he had worked for Sponsor Shipping for six months, (May 2016 to December 2016). Wu went to prison approximately six weeks after his sentencing. Wu did not work for Sponsor Shipping for two years. Thus, Wu's statement to Pretrial Services about Sponsor Shipping was not true.

---

3 Wu told Pretrial Services that he had been "a self-employed consultant for five years" (2013-2018). Wu failed to disclose to the Judge in the Milwaukee case that he was, and had been, a self-employed consultant.

Wu also told Pretrial Services that he was previously a self-employed consultant for five years, 2011-2016. Wu failed to disclose that he was also a self-employed consultant in 2017 and 2018. Instead, Wu described his employment in 2018 as being the manager of a catering company. The Timeline Chart shows that in 2017 and 2018 Wu raised more than $400,000 from investors (while in custody in 2017, and subsequently while on Supervised Release in 2018). Wu did not disclose to Pretrial Services that he was raising funds from investors during 2017 and 2018, as a self-employed business consultant or in any other capacity.

Although Wu may dispute that he committed any fraud in connection with those funds, the records show that Wu did receive and disburse those funds. Wu did not disclose information about his actions raising those funds, or any portion of those funds, to Pretrial Services.

### Wu Violated his Supervised Release

**Investor Sou W-L**: In April 2018, Wu obtained approximately $100,000 from investor Sou W-L ("Sou"). See Timeline Chart. According to Sou, the defendant stated that those funds would be invested in a company known as Lexington, which was an equity investment company. In fact, according to financial records reviewed by the FBI, Wu did not invest those funds in Lexington as promised.

In December 2018, the defendant told Sou that Lexington had issued a capital call, and therefore, Sou needed to provide another $200,000 to Lexington. The defendant sent

Sou a text message asking Sou to provide another $200,000, and Sou responded with a text message in which she agreed to do so. That text message is attached. See Text 12/5/2019 (Redacted and highlights added).

In fact, Lexington had issued a capital call, but it did not relate to Sou's funds, because Wu had not invested any of Sou's money in Lexington. Wu's attempt to obtain $200,000 from Sou was a violation of his Supervised Release.

**Wu Lied About Going to Prison**: Wu was sentenced in the Milwaukee case in December 2016. Wu reported to prison on January 31, 2017. Before reporting to prison (and while on Pretrial Release) Wu told certain investors that he was going to be out of touch for approximately one year, and would not have access to emails or phone calls.

Wu lied about the reason that he would be out of touch. Wu did not disclose to those investors that he had been convicted of fraud. Instead, Wu gave various false explanations to certain investors, including that he was going to go (and did go) on a year long trip to find new investments, and that he was going to go (and did go) to China to be treated for pancreatic cancer.

The defendant raised money from three of those investors (Tom P., Stan F. and Sou W-L) both before and after his incarceration. Specifically, after the defendant was released from custody, he obtained $130,000 from Tom P., and $125,000 from Stan F., as well as $100,000 from Sou W-L. See Timeline Chart.

While Wu was in the half-way house in October 2017, Wu sent an email to investor

Greg C., stating: "Greg, I've missed you my good friend!  Making my way back stateside. Travels were amazing.  Very interesting opportunities and very very interesting people."

While Wu was in the half-way house in October 2017, Wu also sent an email to investor Tom P. in which Wu confirmed (falsely) that he had been treated for pancreatic cancer.  The defendant wrote:  "Tom…I regard you as my best friend…You are my brother for life…you will always have someone you can trust to watch out for your well being and best interest at all time."

The defendant was responding to an email in which Tom wrote:  "WELCOME BACK, and if you have managed to heal yourself from pancreatic cancer you have achieved the incredible.  While I am sure you have to monitor the situation aggressively for quite some time, the fact you can even contemplate a return to business is nothing short of phenomenal."

The defendant responded to that comment by writing: "Monitoring will be required and I am not fully recovered.  However, a re-entry into business and in a phenomenal manner is the only way I will return."

## Wu Contacted Tom P. on February 7, 2019

Tom P. invested approximately $600,000 with the defendant between 2016 and 2018. See Investor Chart.  When the defendant was arrested, Tom P. offered to post bond for the defendant, but withdrew his offer when he learned about the defendant's prior fraud conviction.

On or about February 7, 2019, while Wu was in custody, Wu sent an email to Tom

P.  See Email 2/7/19 attached (highlights added).  In that email Wu wrote:

> I apologize profusely for lying to you….
> Just please please please know that everything we agreed upon is per that.  I did not and never would do otherwise….
> I need to speak with you to provide all important details and hope they are still in play.  To be pragmatic, all of our hard work cannot be let go.  I need help to continue my responsibilities on all of our behalf….
> Please know that I am not what is cast.  I just am not.  I ask for one singular time for us to meet….
> Your former best friend, Ray.

The defendant reached out to this investor after the defendant had been arrested, and

while the defendant was in jail.

### Restitution Order from Milwaukee - $242,529

In December 2016, in the Milwaukee fraud case, Judge Pamela Pepper sentenced

Wu to 12 months and 1 day custody, with three years of Supervised Release, and ordered

Wu to pay restitution of approximately $242,529.

Although Wu obtained more than $400,000 from investors in 2017-2018, Wu has

paid less than $5,000 in restitution.

Based on the financial information that Wu provided prior to sentencing, Judge

Pepper ordered that Wu initially pay $100 a month.  The Judge stated, however, that the

amount of the payments would be adjusted if the defendant earned more money.

The financial information that the defendant provided prior to sentencing in the

Milwaukee case did not include information concerning the funds that Wu had obtained

from investors in 2015 and 2016, or any information that Wu planned to continue obtaining funds from investors.

## Background:  The Milwaukee Fraud Case

**The Fraud:**  In December 2016, Wu pled guilty to committing wire fraud.  Wu admitted that he lied to the two victim investors, who invested $800,000 with Wu.  Wu admitted that he created false documents, including a fake contract with a Kraft Foods, and a false appraisal of a company.  Wu also admitted that he forged the signatures of two individuals on various documents.

**Wu Lacked Remorse:**  At the sentencing, Judge Pepper said that the crime was an extremely serious offense, and that she was very concerned that the defendant did not view his conduct as being wrong.  Sentencing Transcript at p. 56.  Judge Pepper specifically focused on Wu's letter to court, which she read into the record.  Id. At 51.  That letter stated:

"My name is Raymond Wu.  I acknowledge the fact that my involvement with the charges pressed against me and the count of conviction has harmed those in my community, the sanctity of free enterprise and collateral damage in business.  The business I was a part of and the people whom I partnered with working closely and at arm's length began with my poor choice in not knowing the potential impact it could have on those I came in contact with as well as myself and my freedom.  My decision to follow blindly and the continuing of such led to errors in my ways due to the negative influences around me.  I fully understand the reality of how my actions affected those that were a part of the business and the many whom I once served as a role model.  I was influenced by the promise of a sure thing, a path to – a quick path to success and insincere praise.  I fully intend to change in all aspects.  This has been a lesson learned.  I will no longer be lured by the persuasions of gray areas in business and the advice of others.  I desire to become a mentor to our youth and give back to society.  My behavior has impacted my family and friends.  My behavior may have impacted the families of others as well.  I am very remorseful that I have allowed

my actions to impact so many people that I love. I take complete responsibility for my actions and understand the importance of being upright in business dealings." *Id.* at 51-52.

After reading that letter into the record, Judge Pepper then made the following statements:

"In the years that I've been an attorney and a judge, I have never read a more non-apologetic apology in my life. I don't even know what actions Mr. Wu is taking responsibility for. There is no mention in here of the two victims who were victimized by what he did. Mr. Wu seems to indicate…that somebody or other persuaded him or dragged him or guided him into this. I have no idea who that would be….

There is no acknowledgment in either his letter to me and his statement to me -- there's no acknowledgment anywhere, Mr. Wu, that you did these things. In fact, there are sort of sideways arguments to try to dull the impact, but on top of that, there's not even any acknowledgment that those things are wrong, that telling somebody an untruth to get them – to convince them to do business with you and to give you money is wrong. It is fraud. It is a lie. It is not, as you indicated, a gray area in business. It's fraud….

I reduced the guidelines [for acceptance of responsibility] but I have extreme doubt that you've accepted any responsibility for any of this. This letter indicates that you haven't. Your statement indicates that you haven't. I don't see any indication here that you understand that telling these kinds of untruths to someone in business for the purpose of getting them to invest money with you [is wrong], even after you know that they have raided their kids' college funds to get it, even after you k now that they have their own financial problems that they have to deal with. I find this extremely concerning. *Id*. at 52-55.

**False Financial Statement (Milwaukee - December 2016):** The defendant's plea agreement stated: "The defendant agrees to provide to the Financial Litigation United (FLU) of the United States Attorney's Office, at least 30 days before sentencing,…a complete and sworn financial statement." Plea at 8. At sentencing on December 5, 2016, the prosecutor stated that the U.S. Attorney's Office had received the Financial Statement from Wu approximately one week before the sentencing. Sentencing Tr. at 25.

Wu made false statements in the sworn Financial Statement that he submitted in December 2016, which included the following:

• The defendant's address:  Wu stated that he lived in Chicago.  According to the recent PSR,  Wu was living in California at the time.

• Bank accounts:  Wu stated that he had only one bank account at U.S. Bank, which had a balance of $2,000.  In fact, Wu had other bank accounts, including a bank account at Bank of America, which he used to receive and disburse investor's funds.

• Business Ownership:  The form asked "How long have you owned your own business, and What is the nature of your business activity."  Wu stated "N/A" – Not Applicable.  Wu thereby concealed the fact that he had a business, Five Fold Equity Partners, LLC, which he used to raise funds from investors.

• Other debts:  Wu left the answer section blank, and provided no information.  Wu concealed the fact that Wu had collected at least $1 million from investors (excluding the two Milwaukee investors) prior to December 2016, and still owed hundreds of thousands of dollars to investors.

**Failure to File Tax Returns:**  In addition, in the Financial Statement, Wu admitted that he had not filed tax returns for seven calendar years prior to the sentencing. In the December 2016 Financial Statement, Wu admitted that the last tax year for which he filed an income tax return was calendar year 2008.

Thus, Wu admitted that he did not file income tax returns for calendar years 2009, 2010, 2011, 2012, 2013, 2014, or 2015.  During the sentencing, the prosecutor stated that Wu "self-reported that he's earned about $40,000 for the past three years."  Sentencing Transcript at 25.

13

## No Substantial Ties to the Community

Although Wu's parents and his sister in Chicago, those ties are not sufficient to prevent him from fleeing. According to the attorney for Wu's sister, the defendant owes his sister a large sum of money, which he has failed to repay. An email from the attorney for Wu's sister is attached. See Email re Wu's sister.

The defendant has not lived in Chicago for many years. He does not have a job in Chicago, or any in interest in a company, career, or pension in Chicago, or anywhere, that would prevent him from fleeing. Moreover, the defendant does not own property in Chicago, or anywhere, that would prevent him from fleeing.

According to the defendant's sister, when the defendant went to prison, he lied to his family, (including his parents, sister, and certain cousins), falsely representing that he was going to go on an international trip for a year. At that time, he did not tell his family that he had been convicted of fraud.

## Danger to the Community

The information set forth above shows that the defendant continues to lie, commit fraud, violate the court orders, and he had recently contacted an investor. The defendant presents a danger to community because he is likely to continue committing fraud.

14

## Conclusion

The defendant lied to Pretrial Services, violated his conditions of Supervised Release, recently contacted an investor, failed to pay restitution, previously committed a serious fraud, failed to show remorse in that case, and failed to file tax returns for seven years. The defendant presents a risk of flight and a danger to the community, and there are no combination of conditions that will prevent flight or protect the community.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     *s/ Jacqueline Stern*
        JACQUELINE STERN
        Assistant U.S. Attorney
        219 South Dearborn St., Rm. 500
        Chicago, Illinois 60604
        (312) 353-5329

1

<pre>
 1                     UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    WESTERN DIVISION - LOS ANGELES

 3

 4   UNITED STATES OF AMERICA,    )   Case No. MJ 18-3336
                                  )
 5        Plaintiff,              )   Los Angeles, California
                                  )   Wednesday, December 19, 2018
 6            v.                  )   3:02 P.M. to 3:25 P.M.
                                  )
 7   RAYMOND WU,                  )
                                  )
 8        Defendant.             )
     _____)
 9

10

11

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JEAN P. ROSENBLUTH,
13                 UNITED STATES MAGISTRATE JUDGE.

14

15   Appearances:              See Page 2

16   Deputy Clerk:             Bea Martinez

17   Court Reporter:           Recorded; CourtSmart

18   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
19                             Encino, California  91436
                               (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>



2

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:      The United States Attorney's Office
                             Central District of California
 4                           Criminal Division
                             By:   PATRICK CASTANEDA
 5                           312 North Spring Street, 12th Floor
                             Los Angeles, California   90012
 6                           (213) 894-2400
                             USACAC.Criminal@usdoj.gov
 7

 8   For the Defendant:      Federal Public Defender
                             Central District of California
 9                           By:   GEORGINA WAKEFIELD
                             321 East Second Street
10                           Los Angeles, California   90012-4206
                             (213) 894-2854
11                           georgina.wakefield@fd.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    LOS ANGELES, CALIFORNIA, WEDNESDAY, DECEMBER 19, 2018, 3:02 P.M.

2       (Call to Order of the Court.)

3         THE CLERK:  Calling case No. 18-MJ-3336,

4  *United States of America v. Raymond Wu.*

5         Counsel, please state your appearances for the

6  record.

7         PATRICK CASTANEDA:  Good afternoon, Your Honor.

8  Patrick Castaneda on behalf of the United States.

9         THE COURT:  All right.  Hello.

10        GEORGINA WAKEFIELD:  Good afternoon.

11  Georgina Wakefield specially appearing for Seema Ahmad of my

12  office on behalf of Raymond Ping (phonetic) Wu, who's present

13  in custody.

14        THE COURT:  All right.  Mr. Wu, you heard yesterday

15  that Ms. Ahmad could not be here today, and she has gotten

16  Ms. Wakefield to appear for her.  Is that all right with you?

17        THE DEFENDANT:  Yes.

18        THE COURT:  All right.  Thank you.  And you can be

19  seated.  Thanks.

20        All right.  So before I go any further, a couple of

21  things.  I have before me something labeled "Yesterday's

22  Proffer," which I recognize is the travel record, and then I

23  have something labeled "Today's Proffer."

24        So, Mr. Castaneda, I assume this is from you.  Can

25  you tell me what it is?

4

1      MR. CASTANEDA:  Absolutely, Your Honor.  This is

2  the document that you were hoping for yesterday that would

3  provide some corroboration regarding identity and passport

4  number.

5      THE COURT:  Okay.

6      MR. CASTANEDA:  I would also note that the DOB is

7  there as well and, of course, the picture.

8      THE COURT:  Okay.  So I think most significant is

9  that on the document from yesterday, as I pointed out, I

10  thought that was a passport number, it says "Document

11  Number," and then that is listed as Mr. Wu's passport number

12  on this document that I've now gotten for today.

13      And I take it you've shown that to Ms. Wakefield?

14      MR. CASTANEDA:  That is correct.

15      THE COURT:  All right.  I also have reviewed the

16  revised Pretrial Services Report, the one extra page.  So I

17  believe the Pretrial Services officer's name is Brassell?  Is

18  she -- okay.  So can I ask you a couple questions?

19      MS. BRASSELL:  Sure.

20      THE COURT:  So it -- I just want to -- just so that

21  the record is absolutely clear.  So in the original

22  Pretrial Services Report, he stated that he, quote, (Reading)

23  does not possess a passport.  He advised that his only

24  foreign travel was four years ago when he went on a one-week

25  vacation to Cancun, Mexico (end reading).  And so obviously

1    our concern is that the Government has presented these

2    records that appear to show much more international travel.

3    So can you tell me exactly what you asked him and how he

4    answered it?

5            MS. BRASSELL:  Absolutely.  First I said, "Do you

6    have a passport?"

7            He said, "No."

8            THE COURT:  Okay.

9            MS. BRASSELL:  I said, "Have you ever traveled

10   outside of the United States?"

11           He said, "Yes," and provided the trip to -- I said,

12   "When was the last time?"  He gave the trip to Mexico.  I

13   said, "Any other foreign travel?"

14           He said, "What?"

15           I said, "Any other travel outside of the

16   United States?"

17           And he said, "No."

18           THE COURT:  All right.  Okay.  Thank you.

19           All right, Ms. Wakefield.  Did you -- I mean, as I

20   indicated yesterday, this lack of honesty with the

21   Pretrial Services officer is, you know, really a game changer

22   for me and is very significant, and when you add on top of

23   that that it's about foreign travel, which of course goes to

24   flight risk, it's particularly significant.  So if you would

25   like to be heard.

6

1          MS. WAKEFIELD:  Yes, Your Honor.  I believe that

2    the passport was seized by the federal government when he was

3    arrested in 2015.  So he does not have a passport.

4          THE COURT:  Right.  We talked about this yesterday.

5    I mean, it could technically -- it's technically true.  I

6    understand that.

7          MS. WAKEFIELD:  Well, and I assume one of his

8    conditions of supervised release is he shall not travel

9    internationally so there would be no reason, and it's

10   probably in compliance with his supervised release to not get

11   a new passport after his been seized by federal agents.

12         THE COURT:  Well, okay.  But, I mean, you know as

13   well as I do that you can buy fake passports and fake IDs and

14   all sorts of that, and especially for a defendant who's

15   alleged to have committed fraud offenses that that's not --

16   that's small comfort.

17         MS. WAKEFIELD:  Well, I -- of course, any human

18   being in the United States or in the world could buy a fake

19   ID, but I don't think there's any allegation that that's what

20   he's done in either this -- in the case before this Court or

21   in the prior case.  I don't think there's an aggravated

22   identity theft issue.

23         THE COURT:  No, but there are fraud issues, and

24   then there's the lying issue about his travel.

25         MS. WAKEFIELD:  So -- well, I think that -- the

7

1    first issue is the passport --

2              THE COURT:  Okay.

3              MS. WAKEFIELD:  -- and so I wanted to clarify he

4    does not possess a passport.  That is a --

5              THE COURT:  Okay.

6              MS. WAKEFIELD:  -- correct statement.  His passport

7    was seized by the federal government.  It was not returned to

8    him.  He has not applied for a passport since then.

9              Regarding the second question, I think it's clear

10   he didn't understand the question the first time.  He asked,

11   "What?" according to the Pretrial Services officer, and the

12   trip that he did report is the most recent trip, and I think

13   --

14             THE COURT:  Well, it's the one where he was

15   arrested.  So he would know that the authorities would know

16   about that one, and he couldn't not tell the truth about that

17   one.  He was arrested at the airport coming back from Mexico.

18             MS. WAKEFIELD:  Right.  And I think he reported

19   that to the Pretrial Services officer, that that was the trip

20   where he was arrest -- so he reported that travel and

21   followed it up by saying, "That was the trip where I was

22   arrested on my last case," and I don't think that made it

23   into the report in that section.

24             I was looking at the other travel, and I think --

25   it's not clear to me that the first trip was taken because

1  "Status" is blank, and so I was looking at the other trips.

2  There's one that says "Not on board." There's one that says

3  "Request," and so I'm not sure whether he actually took these

4  trips.  I think there is probably enough evidence to show

5  that he took one or two or possibly three other trips, but

6  some of them are not even clear that he took them, and they

7  are from 2013, 2014.

8          So I would point out that sitting in lockup in

9  Roybal is a stressful situation, he was truthful by all

10  accounts on all other answers, and by saying, "What?" in

11  response to the first question, it's clear that he didn't

12  understand what the question was, and I think it's reasonable

13  that he interpreted the question as his "last foreign

14  travel," and there's no history of any foreign travel in

15  violation of his conditions of supervised release.

16          So I think, especially where the presumption is in

17  favor of -- is in favor of release, all the other answers are

18  truthful, that the Court should give the benefit of the doubt

19  to Mr. Wu that in this stressful situation, where he

20  indicated he didn't understand the question the first time,

21  that there was simply a miscommunication, and it's not a

22  question of dishonesty.

23          THE COURT:  All right.  Let me hear from

24  Mr. Castaneda.

25          MR. CASTANEDA:  Thank you, Your Honor.  A couple

9

1  things the Government would like to point out at the outset,
2  in fact, before addressing the issue of the proposed travel.

3  Based on the existing facts, the Court is well
4  within reason for finding a flight risk based on his criminal
5  activity while under supervision alone, and in this instance,
6  I would point out that, although the nature of the crime is
7  something that is probably lowest on the totem pole for this
8  assessment, the nature of the crime alleged involved
9  fraudulent activities while at the Federal Bureau of Prisons
10 halfway house.  So on that basis alone, Your Honor, you know,
11 respectfully, but irrespective of yesterday's recommendation
12 that he be let out on bond, the Court is well within its
13 reason.  So I just want to clarify that, that, you know,
14 whether or not this issue of travel is cleared up or not, it
15 shouldn't be considered dispositive on the merits alone.

16 Now, with respect to the Court's concern, I heard
17 Ms. Brassell describe her conversation with the defendant,
18 and the Government doesn't hear anything with respect to lack
19 of communication.  There was a question raised, it sounds
20 like, from the defendant.  However, it does sound like the
21 conversation did proceed in a reasonable manner with someone
22 who does speak English and knew what he was being asked.

23 Now, with respect to the document itself, I would
24 also point out that there is that column identifying several
25 statuses with "On board," "On board," "On board,"

10

1    "Passenger," "Passenger."  There are several references that

2    provide at least a preponderance of the evidence that this is

3    a document that establishes that Mr. Wu has, in fact,

4    traveled outside of the United States.  Taking --

5            THE COURT:  Well, so let me -- I just want to make

6    sure that I understand the facts here.  So the first two --

7    you know, since it doesn't say anything about status, if I

8    get rid of those, the second one, "BJX," what is that?  Oh,

9    Mexico.  All right.

10           MR. CASTANEDA:  I believe "BJX" is --

11           THE COURT:  Mexico.

12           MR. CASTANEDA:  -- Mexico.  Del Bajio --

13           THE COURT:  All right.

14           MR. CASTANEDA:  -- Leon, Mexico.

15           THE COURT:  And the next one is Mexico, and the

16   next one is Mexico, and the next one where he's not on board,

17   and then the next one is Mexico.  The next one is Haiti.

18           MR. CASTANEDA:  And I believe there's also a

19   Taipei.

20           THE COURT:  One second.  8133 is also Mexico.

21   Mexico.  Mexico.  Well, the Taipei one, "TPE," says

22   "Request."  Do you have any idea what that means?

23           MR. CASTANEDA:  Actually, I do not.

24           MS. WAKEFIELD:  And, Your Honor, I think these are

25   both -- both legs of the flight.  So these -- this would be

11

1  one trip for two rows.

2         THE COURT: Well, but the next row says "On board"

3  for Taipei.

4         MS. WAKEFIELD: Right. But the -- when the Court

5  was indicating, "Mexico," "Mexico," "Mexico" --

6         THE COURT: Oh, okay. Yeah. No, that I

7  understood. Thank you, though.

8         So he apparently was in Taipei at some point in

9  2014 -- late 2014. And then Haiti again, and Haiti, and

10  Mexico. Mexico. Mexico.

11        All right. So it looks like there's not enough

12  evidence that he went to Australia -- Brisbane -- but that

13  the Mexico, Haiti, and Taipei are all substantiated.

14        All right. So go ahead. You wanted to talk about

15  the travel?

16        MR. CASTANEDA: So just with respect to the travel,

17  you know, to the extent that there is a "he said, she said,"

18  you know, issue here, you know, I would obviously defer to

19  the conversation that was had and the description of that

20  conversation with somebody who actually had that conversation

21  with the defendant.

22        Going forward, with respect -- and that's just with

23  respect to flight, which, as you know, of course, is a

24  preponderance. I believe the Government has established that

25  without even discussing this -- these travel arrangements but

12

 1  even more so adding this on top of that.

 2          Now, with respect to danger, ultimately, that is

 3  probably the greater concern here.  As I pointed out earlier,

 4  you know, the defendant has been convicted previously of

 5  fraud, within the last three years -- last three to four

 6  years, and the alleged activity occurred while under

 7  supervision, and not just while under supervision out on his

 8  own, while under supervision while he was at a halfway house.

 9          So with all those packaged together, Your Honor, I

10  do believe that reason does dictate that the defendant be

11  held.

12          THE COURT:  All right.  Ms. Wakefield, did you have

13  anything further you wanted to say?

14          MS. WAKEFIELD:  Yes.  The -- I think the bond here

15  is pretty significant, and both of the proposed sureties are

16  present in court today.

17          And Mr. Wu -- as the Court knows, he's a college

18  graduate.  He's a U.S. citizen.  He doesn't have foreign

19  ties.  His entire family is in Chicago.  There's not anyone

20  outside of the United States to the extent that's the

21  concern.

22          THE COURT:  Well, but then there was -- he

23  apparently told the Pretrial Services officer also, I believe

24  -- and maybe I can ask her.  I believe the Pretrial Services

25  officer who was there yesterday represented that he said that

1  he had to travel for business; is that correct?

2  Internationally?

3      MS. BRASSELL:  I believe that he -- that was

4  information provided by his probation officer.  Yes.

5      THE COURT:  Oh, by his -- that he had told the

6  probation officer?

7      MS. BRASSELL:  Yes.

8      THE COURT:  All right.  Thank you.

9      MS. WAKEFIELD:  But he has not traveled.

10     THE COURT:  Okay.  I don't know why he would tell

11 his probation officer that he had to travel internationally

12 --

13     MS. WAKEFIELD:  Well, that would be --

14     THE COURT:  -- for his job?

15     MS. WAKEFIELD:  -- two levels of hearsay at this

16 point.

17     THE COURT:  Okay.  Which is permissible here but --

18 look.  Let me be frank with you.  If it weren't for this

19 issue of what I consider to be lying to the Pretrial Services

20 officer, I most likely would have set bond because I agree

21 with you that the equity in the house is substantial and --

22 although I think that the conduct that's alleged to have

23 taken place here is abhorrent, you know, committing further

24 fraud while you're at the halfway house right after getting

25 out of prison for your prior fraud offense is, as

14

1   Mr. Castaneda says, really significant risk of danger to the

2   community, but I think with the big equity and some kind of

3   electronic monitoring or something I probably would have set

4   bond.

5           But I'm not going to because the Pretrial Services

6   officer is an independent officer of the court, who is not

7   playing for the Government's side or the defendant's side,

8   and she would have no reason to make up what he said, and it

9   seems to me that, based on her recounting of this

10  conversation, that this was an intentional attempt to not

11  tell the truth, to -- about the foreign travel experience,

12  and I just don't see that -- as Mr. Castaneda pointed out,

13  Mr. Wu speaks English, he's a citizen, there's no question of

14  any kind of language barrier, and the way she recounted the

15  conversation, it was pretty clear that she asked a

16  straightforward question and he didn't answer it honestly.

17          MS. WAKEFIELD:  Well, I think, taking a step back

18  -- no one is accusing Ms. Brassell of lying.  What I'm saying

19  is in the context of this conversation, which is Mr. Wu is

20  handcuffed to a chair --

21          THE COURT:  But he -- actually, but let me just --

22  you can address this.  I know I'm interrupting you, but it

23  seems to me that, rather than the characterization you're

24  giving it, he lied twice.  So he -- she -- he first said --

25  she asked him if he had any international travel, and he

1   mentions the one trip that he knows the Government already

2   knows about, and he doesn't mention the others.  And then I

3   believe she asked, "There's nothing else?" and he said,

4   "What?" and then he lied again.  So it's like he lied once

5   and then he -- there was some other exchange, and then he

6   said the exact same lie again.  So I just -- I didn't write

7   down word-for-word what she said, but it seems to me that it

8   can be characterized as him doing it twice.

9           MS. WAKEFIELD:  I thought the question was "Have

10  you traveled outside of the United States?" and he said,

11  "Yes," and the --

12          THE COURT:  No.  I think it was "Have you ever" --

13          Well, why don't you tell us --

14          MS. WAKEFIELD:  Yeah.

15          THE COURT:  -- one more time.  And then I -- your

16  -- you had this conversation, and as Mr. Castaneda pointed

17  out, you were -- you're a percipient witness.  So I'd like to

18  hear your impressions of his truthfulness.

19          MS. BRASSELL:  I felt like he was being misleading.

20  One of the other things that came up -- I believe

21  Ms. Wakefield said that after -- when he said he went on the

22  trip to Mexico, that he then told me that he got arrested at

23  the airport, and that's not correct.  I did not realize he

24  had been incarcerated because I didn't look in his case file

25  until after the interview, and that did not come up until we

16

1   got to the employment section.   When -- the entire

2   residential, he never told me he was at the Bureau of Prisons

3   when we went back, and we go back about five years, and then,

4   when I got to the employment portion and I said, "Were you

5   employed before that?" he said, "No.   I was incarcerated,"

6   and that's when it finally came up.

7           So, overall, I felt like he was misleading me.   The

8   way that I phrased the question was "When was the last time

9   you traveled outside of the United States?"   He gave me the

10  trip to Mexico.   I then said, "Any other foreign travel?"

11          He said, "What?"

12          And I said, "Any other travel outside of the

13  United States?"

14          THE COURT:   And then he said, "No."

15          MS. BRASSELL:   And he said, "No."

16          THE COURT:   Okay.   Well, then that's only one lie.

17  Thank you.

18          MS. WAKEFIELD:   Thank you, Your Honor.

19          THE COURT:   I'm sorry.

20          And thank you for the clarification.

21          MS. WAKEFIELD:   Small victories.

22          THE COURT:   Yeah.

23          MS. WAKEFIELD:   So "When was the last time you

24  traveled outside of the United States?"   So that was the

25  question.   He answered it --

1     THE COURT:  And he answered that truthfully.

2     MS. WAKEFIELD:  -- truthfully.

3     And so I do want to emphasize -- I mean, I've sat

4  through these interviews before, and there was no counsel

5  present for Mr. Wu during this interview.  He, you know, is

6  chained to a chair, sitting behind a screen, where you can't

7  really see the other person on the other side.  So it's not

8  like you can read someone's lips or try to get a sense of

9  what they're saying that way, and it's a stressful situation.

10     And I think -- on the other side, I think Pretrial

11  has a very stressful job as well, and I think the calendar --

12  understanding is the calendar yesterday was busy, and there's

13  pressure to get reports done and written, to the Court by the

14  2:00 o'clock -- or as close to the 2:00 o'clock deadline as

15  possible, and so I think in this context there -- it's just

16  completely ripe for miscommunication, and I think, given that

17  the background information has been verified by Mr. Wu's

18  girlfriend, I think the Court should grant the benefit of the

19  doubt that this was a misunderstanding, not an intentional

20  lie.

21     And I agree with the Government that this is not a

22  dispositive issue, and so I would request with the

23  significant bond that's being proffered here, with the

24  stringent conditions that the Court can impose, including

25  electronic monitoring, I think this is a case that warrants

18

1   release.

2           THE COURT:  All right.  I mean, I'm not going to

3   put you on the spot, but I'm not sure where you came up with

4   him having told her that he was arrested at the airport

5   during that trip to Mexico because, if that's what he told

6   you, apparently that wasn't true either.

7           MS. WAKEFIELD:  I thought that was in the

8   Pretrial Services Report but it wasn't placed in the travel

9   section.

10          THE COURT:  Well --

11          MS. WAKEFIELD:  I'm not sure where I got that,

12  then.  I thought I read it.  Or maybe Seema -- I mean,

13  Ms. Ahmad told me.  I'm not sure.

14          THE COURT:  Okay.

15          I mean, honestly, I really -- you know, as I said,

16  I am on the fence in the sense that there is a substantial

17  bond being offered and that -- you know, I -- without this

18  allegation, I probably would set some kind of bond, but given

19  this whole thing about the travel and the Pretrial Services

20  officer's representation as a -- somebody who was there that

21  he was attempting to mislead her and that he did mislead her,

22  and given the underlying facts of the allegations of the

23  current offense, which you know, to me it just boggles the

24  mind that you get out of prison, you know, for one fraud

25  offense and you get on the computers at the halfway house and

19

1   start doing it again.  I mean, I just -- that's really worse

2   than the average fraud offense.

3          So I think that, given all of this, I just don't

4   think that there is any condition or combination of

5   conditions that would reasonably assure either his appearance

6   as required or the safety of the community or any person in

7   it.

8          As to flight risk, again, just to summarize, the

9   fact that the current allegations concern conduct that was

10  committed while on supervised release at the halfway house

11  for a prior similar offense and the fact that apparently

12  there was extensive foreign travel history that was not

13  revealed to Pretrial Services.

14         As to danger, it's, again, the alleged offense,

15  conduct having been committed while on supervised release for

16  the prior similar conviction and, again, the fact that he

17  gave these false statements to Pretrial.

18         So I appreciate counsel's argument and, honestly, I

19  -- it's a close call that, without that one factor, I

20  probably would have gone the other way, but I just can't do

21  it here.  So he will be detained pending trial.

22         All right.  Is there anything further?

23         MR. CASTANEDA:  Nothing from the Government,

24  Your Honor.

25         THE COURT:  One second.  My CRD is --

1          (Court confers with clerk.)

2          THE COURT:  Did we -- she's reminding me.  Did we

3    set a PIA date?

4          THE CLERK:  No, no, not a PIA date.

5          MR. CASTANEDA:  I don't believe so, Your Honor.

6          THE COURT:  No, it was the PIA date that we had to

7    do.

8          THE CLERK:  (Indecipherable.)

9          MS. WAKEFIELD:  This is an out-of-district --

10          MR. CASTANEDA:  This is a --

11          THE COURT:  Oh, this is an out-of-district?

12          MR. CASTANEDA:  Yeah.

13          THE COURT:  That's right.

14          THE CLERK:  (Indecipherable.)

15          THE COURT:  Oh, all right.  She's -- she always

16    knows more than me.

17          Mr. Castaneda, I am supposed to ask you as --

18    correctly, as she's pointed out, is -- do -- are you aware of

19    any reporting date?  This is from the Northern District of

20    Illinois; is that correct?

21          MR. CASTANEDA:  That's correct.  I do not have a

22    reporting date yet.

23          THE COURT:  All right.  So --

24          MR. CASTANEDA:  But I am in contact with the out-

25    of-district AUSA.  So I can get that information.

21

1          THE COURT:  Well, but it doesn't -- I mean, I,
2    technically, would have to order him to appear on such-and-
3    such a date, but I can pick an arbitrary date to --
4          Ms. Wakefield?
5          MS. WAKEFIELD:  I don't know that the Court needs
6    to order a date since the marshals will be transporting him.
7          THE COURT:  She's nodding her head again.
8          Usually I set some arbitrary date just so that --
9    and then they can change it in the other district, but I'll
10   -- all right.  I'll just order that he be transported
11   forthwith to the Northern District of Illinois, and I'll hold
12   him to answer there.
13         Is that everything?  Maybe it was the other case
14   that we continued, but I thought that -- it's the other case?
15   All right.
16         MR. CASTANEDA:  There is another case, Your Honor.
17         THE COURT:  And there I have to set some dates, but
18   I guess in this one --
19         MR. CASTANEDA:  Sure.
20         THE COURT:  -- that's all I had to do.  All right.
21   Thank you.  I would be lost without her.
22         All right.  Thank you.
23         MR. CASTANEDA:  Thank you, Your Honor.
24         THE CLERK:  This court is now adjourned.
25         (Proceedings adjourned at 3:25 P.M.)

22

1

2

3

4                              CERTIFICATE

5           I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa                February 7, 2019
     Julie Messa, CET**D-403        Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED
CLERK, U.S. DISTRICT COURT

2018
DEC 19 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No.: MJ 18-3336 |
| Plaintiff, ) | ORDER OF DETENTION |
| vs. ) | |
| _Raymond Wu_____, ) | |
| Defendant. ) | |

## I.

A.   ( )   On motion of the Government in a case allegedly involving:

    1.   ( )   a crime of violence.

    2.   ( )   an offense with maximum sentence of life imprisonment or death.

    3.   ( )   a narcotics or controlled substance offense with maximum sentence of ten or more years.

    4.   ( )   any felony - where defendant convicted of two or more prior offenses described above.

    5.   ( )   any felony that is not otherwise a crime of violence that involves a minor victim, or possession or use of a firearm or destructive device or any other dangerous weapon, or a failure to register under 18 U.S.C. § 2250.

GOVERNMENT
EXHIBIT
Detention
Order

1   B.   (X)   On motion by the Government/( ) on Court's own motion, in a case

2   allegedly involving:

3   (X)   On the further allegation by the Government of:

4   1.   (X)   a serious risk that the defendant will flee.

5   2.   ( )   a serious risk that the defendant will:

6   a.   ( )   obstruct or attempt to obstruct justice.

7   b.   ( )   threaten, injure or intimidate a prospective witness or

8   juror, or attempt to do so.

9   C.   The Government ( ) is/(X) is not entitled to a rebuttable presumption that no

10   condition or combination of conditions will reasonably assure the defendant's

11   appearance as required and the safety or any person or the community.

12

13   **II.**

14   A.   (X)   The Court finds that no condition or combination of conditions will

15   reasonably assure:

16   1.   (X)   the appearance of the defendant as required.

17   (X)   and/or

18   2.   (X)   the safety of any person or the community.

19   B.   ( )   The Court finds that the defendant has not rebutted by sufficient evidence to

20   the contrary the presumption provided by statute.

21

22   **III.**

23   The Court has considered:

24   A.   (X)   the nature and circumstances of the offense(s) charged, including whether

25   the offense is a crime of violence, a Federal crime of terrorism, or involves

26   a minor victim or a controlled substance, firearm, explosive, or destructive

27   device;

28   B.   (X)   the weight of evidence against the defendant;

1  C.   (✗)   the history and characteristics of the defendant; and

2  D.   (✗)   the nature and seriousness of the danger to any person or the community.

3

4                                   **IV.**

5       The Court also has considered all the evidence adduced at the hearing and the

6  arguments   and/or   statements   of   counsel,   and   the   Pretrial   Services

7  Report/recommendation.

8

9                                   **V.**

10      The Court bases the foregoing finding(s) on the following:

11  A.   (✗)   As to flight risk:

12       ~~no known bail resources~~

13       ~~unverified background information~~

14       current charges were committed while on SR for

15       prior similar offense

16       extensive foreign-travel history that was not

17       revealed to pretrial services

18       told probation officer in prior case that he had

19       to travel internationally for his job

20

21  B.   (✗)   As to danger:

22       alleged offense conduct committed while on

23       SR for prior similar conviction

24       gave false statements to pretrial

25       would be very difficult to monitor computer

26       usage, his vehicle for committing fraud crimes

27

28

1

**VI.**

2    A.    ( )    The Court finds that a serious risk exists the defendant will:

3                 1.    ( )    obstruct or attempt to obstruct justice.

4                 2.    ( )    attempt to/ ( ) threaten, injure or intimidate a witness or juror.

5    B.    The Court bases the foregoing finding(s) on the following:

6         _____

7         _____

8         _____

9

10

**VII.**

11    A.    IT IS THEREFORE ORDERED that the defendant be detained prior to trial.

12    B.    IT IS FURTHER ORDERED that the defendant be committed to the custody of the

13       Attorney General for confinement in a corrections facility separate, to the extent

14       practicable, from persons awaiting or serving sentences or being held in custody

15       pending appeal.

16    C.    IT IS FURTHER ORDERED that the defendant be afforded reasonable opportunity

17       for private consultation with counsel.

18    D.    IT IS FURTHER ORDERED that, on order of a Court of the United States or on

19       request of any attorney for the Government, the person in charge of the corrections

20       facility in which defendant is confined deliver the defendant to a United States

21       marshal for the purpose of an appearance in connection with a court proceeding.

22

23

24    DATED: Dec. 19, 2018                        

25                           JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

26

27

28

| No. | Name | Investments & Loans | Payouts or Investments | Net Loss |
|-----|------|--------------------:|----------------------:|---------:|
| | **INVESTOR SUMMARY - RE: RAYMOND WU** | | | |
| 1 | LAURA A. | $401,650 | $293,000 | $108,650 |
| 2 | JAKE B. | $20,850 | $0 | $20,850 |
| 3 | JOE C. | $10,850 | $0 | $10,850 |
| 4 | GREG C. | $250,000 | $50,000 | $200,000 |
| 5 | STAN F. | $200,000 | $0 | $200,000 |
| 6 | STEFAN J. | $9,500 | $0 | $9,500 |
| 7 | TOM P. | $600,000 | $0 | $600,000 |
| 8 | SHU M-W. | $350,000 | $249,000 | $101,000 |
| 9 | SOU W-L. | $295,000 | $70,000 | $225,000 |
| | | | | |
| | **Total** | **$2,137,850** | **$662,000** | **$1,475,850** |
| | | | | |
| | **DRAFT** | | | |



GOVERNMENT
EXHIBIT
Investor
Chart

CARDELL 800-788-0369

| TIMELINE - INVESTMENTS/LOANS BY DATE | | | DRAFT |
|---|---|---|---|
| Date | Name | Investment | Milwaukee Case |
| **2009** | | | |
| 3/20/2009 | SHU M-W | $200,000 | |
| 12/11/2009 | SHU M-W | $150,000 | |
| **2012** | | | |
| 5/4/2012 | SHU M-W | $50,000 | |
| 11/13/2012 | JOE C. | $10,850 | |
| **2013** | | | |
| 8/30/2013 | GREG C. | $25,000 | |
| 10/1/2013 | GREG C. | $75,000 | |
| 1/17/2013 | JAKE B. | $10,850 | |
| 1/31/2013 | JAKE B. | $10,000 | |
| **2014** | | | |
| 3/25/2014 | GREG C. | $50,000 | |
| 4/29/2014 | GREG C. | $50,000 | |
| 9/15/2014 | GREG C. | $20,000 | |
| 10/14/2014 | GREG C. | $30,000 | |
| **2015** | | | |
| 4/2/2015 | SOU W-L | $12,500 | |
| 4/30/2015 | SOU W-L | $30,000 | |
| 5/26/2015 | | | Arrested by the FBI at LA Airport |
| 5/29/2015 | SOU W-L | $30,000 | |
| 6/15/2015 | SOU W-L | $35,000 | |
| 6/18/2015 | | | Arraignment |
| 7/7/2015 | SOU W-L | $17,500 | |
| **2016** | | | |
| 4/11/2016 | | | Guilty Plea |
| 7/5/2016 | STAN F. | $50,000 | |
| 9/21/2016 | TOM P. | $250,000 | |
| 12/5/2016 | | | Sentenced to 1 year in prison, restitution of $242,529, and 3 years Supervised Release |
| **2017** | | | |
| 1/5/2017 | LAURA A. | $150,000 | |
| 1/27/2017 | TOM P. | $25,000 | |
| 1/31/2017 | | | Reported to FCI Taft to begin 1 year sentence |
| 2/1/2017 | TOM P. | $25,000 | |
| 2/15/2017 | LAURA A. | $50,000 | |
| 2/17/2017 | LAURA A. | $1,650 | |
| 3/16/2017 | LAURA A. | $50,000 | |
| 4/18/2017 | LAURA A. | $75,000 | |
| 5/16/2017 | TOM P. | $20,000 | |
| 5/18/2017 | LAURA P. | $25,000 | |



GOVERNMENT EXHIBIT
Timeline Chart
CARDELS 800-783-0099

| | | | |
|---|---|---|---|
| 6/21/2017 | LAURA P. | $25,000 | |
| 7/25/2017 | LAURA P. | $25,000 | |
| 7/28/2017 | TOM P. | $50,000 | |
| 9/14/2017 | | | Assigned to BOP's Vinewood Residentical Reentry Center, L.A.(halfway house) |
| 10/17/2017 | STANLEY F. | $25,000 | |
| 12/12/2017 | | | Released from BOP custody and began three years supervised release |
| 12/15/2017 | TOM P. | $25,000 | |
| 12/27/2017 | TOM P. | $25,000 | |
| 2018 | | | |
| 1/3/2018 | TOM P. | $80,000 | |
| 1/26/2018 | STAN F. | $25,000 | |
| 3/14/2018 | STAN F. | $50,000 | |
| 4/13/2018 | SOU W-L | $100,000 | |
| 10/22/2018 | STAN F. | $50,000 | |
| | | | |
| Total | | $1,808,350 | |
| | | | |
| | DRAFT | | |
| | | | |



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

12/17/2018 18:43 EST          Generated By: TARYN BREWER          Page 1 of 2

| | Last Name | First Name | DOB | Doc Type | Document Number | Date - Time | Carrier Code | Carrier Num. | I/O | Site | Insp | Type | Status | Ref | Arr Loc | Dep Loc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ① | WU | RAYMOND P | | P | 460550818 | 01/21/2012 00:00 | QF | 16 | O | | Name No Name, No | APIS | | Brisbane | BNE | LAX |
| | WU | RAYMOND P | | P | 460550818 | 02/11/2012 09:50 | QF | 15 | I | A273 | TROZERA, WILLIAM | APIS | | | LAX | BNE |
| ② | WU | RAYMOND P | | P | 460550818 | 05/21/2013 00:00 | UA | 4183 | O | | Name No Name, No | APIS | ON BOARD | Mexico | BJX | IAH |
| | WU | RAYMOND P | | P | 460550818 | 05/24/2013 21:20 | UA | 4277 | I | A534 | WILLIAMS, GEORGE | APIS | ON BOARD | | IAH | BJX |
| ③ | WU | RAYMOND P | | P | 460550818 | 12/09/2013 00:00 | UA | 4135 | O | | Name No Name, No | APIS | ON BOARD | Mexico | BJX | IAH |
| | WU | RAYMOND | | P | | 12/14/2013 00:00 | UA | 1537 | I | | Name No Name, No | APIS | NOT ON BOARD | | LAX | BJX |
| | WU | RAYMOND P | | P | 460550818 | 12/19/2013 10:34 | UA | 4267 | I | A534 | NGUYEN, NGAN | APIS | ON BOARD | | IAH | BJX |
| ④ | WU | RAYMOND P | | PN | 460550818 | 12/21/2013 00:00 | VES | 9383936 | O | | Name No Name, No | CRUISE SHIP | PASSENGER | Haiti | 8092 | AV43 |
| | WU | RAYMOND | | PN | 460550818 | 12/28/2013 00:00 | VES | 9383936 | I | | Name No Name, No | CRUISE SHIP | PASSENGER | | 5203 | 8133 |
| ⑤ | WU | RAYMOND P | | P | 460550818 | 02/10/2014 00:00 | UA | 4418 | O | | Name No Name, No | APIS | ON BOARD | Mexico | BJX | IAH |
| | WU | RAYMOND P | | P | 460550818 | 02/14/2014 19:58 | UA | 4582 | I | A534 | GARZA, MARIO | APIS | ON BOARD | | IAH | BJX |
| ⑥ | WU | RAYMOND P | | P | 460550818 | 11/02/2014 00:00 | BR | 15 | O | | Name No Name, No | APIS | REQUEST | Taipei | TPE | LAX |
| | WU | RAYMOND P | | P | 460550818 | 11/24/2014 23:26 | BR | 16 | I | A273 | APC TBIT AUTOMATED PASSPORT CONTROL, LAX | APIS | ON BOARD | (Taipei to LA) | LAX | TPE |
| ⑦ | WU | RAYMOND | | PN | 460550818 | 12/06/2014 00:00 | VES | 9383936 | O | | Name No Name, No | CRUISE SHIP | PASSENGER | Haiti | 8092 | AV43 |
| | WU | RAYMOND | | PN | 460550818 | 12/13/2014 00:00 | VES | 9383936 | I | | Name No Name, No | CRUISE SHIP | PASSENGER | | 5203 | 8133 |
| ⑧ | WU | RAYMOND P | | P | 460550818 | 01/03/2015 00:00 | UA | 1276 | O | | Name No Name, No | APIS | ON BOARD | Mexico | CUN | LAX |
| | WU | RAYMOND P | | P | 460550818 | 01/08/2015 17:36 | UA | 1017 | I | A534 | APC AUTOMATED PASSPORT CONTROL, IAH | APIS | ON BOARD | | IAH | CUN |
| ⑨ | WU | RAYMOND P | | P | 460550818 | 05/18/2015 00:00 | UA | 1154 | O | | Name No Name, No | APIS | ON BOARD | Mexico | CUN | IAD |
| | WU | RAYMOND P | | P | 460550818 | 05/24/2015 14:46 | UA | 1653 | I | A278 | CASE, MARK | APIS | ON BOARD | CUSTOMS | LAX | CUN |

Total Number of Records: 19

**For Official Use Only / Law Enforcement Sensitive**





**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
**TECS - Person Encounter List**

12/17/2018 18:43 EST                    Generated By: TARYN BREWER                                    Page 2 of 2

| Legend | |
|---|---|
| **Loc** | |
| **Codes** | **Value** |
| BJX | DEL BAJIO, LEON MX |
| IAH | HOUSTON INTERCONTINENTAL |
| LAX | LOS ANGELES, CA INTL |
| 8133 | MEXICO |
| BNE | BRISBANE |
| 5203 | PORT EVERGLADES - FORT LAUDERDALE |
| TPE | TAIPEI, CHIANG KAI SHEK |
| AV43 | UNKNOWN |
| 8092 | HAITI |
| CUN | CANCUN |
| IAD | DULLES INTL |

| Doc Type | |
|---|---|
| **Codes** | **Value** |
| P | P - PASSPORT |
| PN | PN - PASSPORT |

| Site Code | |
|---|---|
| **Codes** | **Value** |
| A273 | A273 - LOS ANGELES, BRADLEY AP LAX |
| A534 | A534 - CBP-HOUSTON, BUSH INTL AIRPORT |
| A278 | A278 - CBP-LOS ANGELES, LAX TERM 7 |

**For Official Use Only / Law Enforcement Sensitive**

| Financial Statement |
| --- |

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                           Case No.  15-CR-33

RAYMOND WU

        Defendant.

| Name and Address | Home Phone Number | Marital Status       Date of Marriage |
| --- | --- | --- |
| Raymond Wu<br>████ S Michigan Ave<br>Chicago, IL 60616 | Cell Phone Number<br><br>████ Email Address | Spouse's Name<br>Arum "Cassidy" Song |
| | Social Security Number | Spouse's SSN |

| Employer or Business (Name and Address) | | Check |
| --- | --- | --- |
| Sponsorshipping LLC<br>108 W 2ⁿᵈ Street<br>Los Angeles, CA 90012 | | Appropriate ☐<br>Box: Wage ☐<br>☐<br>Earner ☐<br>☐ |
| | How Long Employed?<br>6 months | Business Phone Number<br>702-578.5420 |

| Spouse's Employer or Business (Name and Address) | | Check |
| --- | --- | --- |
| Unknown | | Appropriate ☐<br>Box: Wage ☐<br>Earner |

| Occupation | How Long Employed? | Business Phone Number: |
| --- | --- | --- |
| Unknown | Unknown | Unknown |

**YOU ARE DIRECTED TO CAREFULLY READ AND FULLY ANSWER EACH AND EVERY QUESTION ON THIS FINANCIAL STATEMENT.  SHOULD A QUESTION OR SECTION <u>NOT</u> APPLY TO YOU, INDICATE SAME ON THE STATEMENT UNDER THAT PARTICULAR QUESTION OR SECTION.**



GOVERNMENT
EXHIBIT
Financial
Statement

| Home Address and phone number of next of kin or other reference<br><br>Erica Lee<br><br>███████ | Other Names or Aliases | Previous Address within 5 years |
|---|---|---|

| Age and relationship of dependents living in your household (excluding yourself and spouse) |
|---|

| Date of Bi▶<br>███████ | For Defendant | For Spouse | Tax Yr of latest filed income tax return.   2008<br><br>▶ **You are DIRECTED to FORWARD a signed copy of your latest income tax** |
|---|---|---|---|

I = Individual          J = Joint

| | BANK ACCOUNTS (include all personal and business checking accounts, savings accounts, Savings & Loans, Credit Unions, CD's, IRA & KEOUGH ACCOUNTS, PENSION | | | | | |
|---|---|---|---|---|---|---|
| I/J | Name of Institution | Addre<br>ss | Type<br>of | Accou<br>nt | Personal<br>or | Balance |
| | US Bank | | Chk | ██████ | personal | 2000.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

2 | Page

## SAFE DEPOSIT BOXES (Rented or Accessed)

Do you have a Safe Deposit Box?  _____ Yes  __x__ No.
If yes, please complete the bottom of this section for each box you have.

Is there any other person(s) holding assets or documents for you in any Safe

Are you designated deputy and/or do you have access to anyone else's Safe
Deposit Box?                                                              Yes    x

Do you have a will and where is it kept?  Provide this office with a copy of your last will and

| I/J | Name and Address of Location of Safe Deposit Box | | Box Number |
|-----|--------------------------------------------------|--------|------------|
| None | | None | None |
| | | | |

## SECURITIES (Stocks in public and closely held corporations, bonds, mutual funds, U.S. Govt.

| I/J | Name and Kind of Company | Location of shares | No. of Units | Fair Market Value |
|-----|--------------------------|--------------------|--------------|-------------------|
| None | | | | |
| | | | | |

If you hold stock in any closely held corporations, provide copies of corporate tax returns for the last two years.

During the past two years, did you have a security trading account with a broker?       If yes, identify the brokerage firm(s), account number(s), state the name(s) of the account(s)

| I/J | Brokerage Firm | Account Name | Account Number |
|-----|----------------|--------------|----------------|
| None | | | |
| | | | |

Are you a member of any investment or barter trading clubs?       If so, provide account statements for the last two years showing investments and current club value. None

## REAL ESTATE (Include home equity loans under mortgage balance)

| I/J | Address | Purch. | Purch. | Fair Market | Mortgage Date | Monthly Payment | Date Mtg. |
|-----|---------|--------|--------|-------------|---------------|-----------------|-----------|
| None | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

If any real estate holdings are income producing properties, identify tenants and current lease terms. Provide income statements and/or tax returns for the last two years for each rental property.

## BUSINESS HOLDINGS

How long have you owned your own business or businesses? N/A

What is the nature of your business activity.

Are you involved in any business or personal partnerships? If so, what is the nature of the activity of your partnership holdings?

Provide income and profit statements, balance sheets and income tax returns of your business and/or

Provide a current listing of accounts receivable and accounts payable for your business and/or

## LIFE INSURANCE

| Name and address of co | Policy Number | Typ e | Face Amt | Cash Surrend | Amount Borrowe | Amt you can |
|---|---|---|---|---|---|---|
| None | | | | | | |

## MORTGAGES HELD BY YOU

| I/J | Mortgagee (name and address) | Mortgage Balance | Monthly Payment | Date Mtg will | Balloon Payment |
|---|---|---|---|---|---|
| | None | | | | |

## MOTOR VEHICLES (Include cars, trucks, mobile homes, boats, airplanes, etc., which are owned or

| I/J | Year, make and license number | Fair Market Value | Loan Balance | Monthly Payment | Date loan will |
|---|---|---|---|---|---|
| | 2003 Toyota Camry | 3000.00 | None | | |

## OTHER ASSETS (including, BUT NOT LIMITED TO, cash on hand, copyrights, patents, interests in partnerships, jewelry, coins, precious metals, personal/business notes or personal/business accounts

| I/J | Description | Fair Market Value | Loan Balance | Monthly payment | Date loan will be |
|---|---|---|---|---|---|
| | Necklace from Grandmother | 1000 | | | |
| | Family Heirloom from Grandmother | 1000 | | | |

## CHARGE ACCOUNTS AND LINES OF CREDIT (Bank credit cards, lines of credit, revolving charge

| I/J | Type of Acct or Card | Name & Address of Creditor | Credit Limit | Amount Owed | Credit Available | Minimum |
|-----|----------------------|----------------------------|--------------|-------------|------------------|---------|
|     | N/A | | | | | |
|     | | | | | | |
|     | | | | | | |
|     | | | | | | |
|     | | | | | | |

## OTHER DEBTS (Including delinquent taxes)

| I/J | Owed To | Address | Relationship | Amount Owed |
|-----|---------|---------|--------------|-------------|
|     | Vendors? | | | |
|     | | | | |
|     | | | | |

## DISPOSAL OF ASSETS - FOR THE PREVIOUS 5 YEAR PERIOD TO THE PRESENT, have you disposed of any assets or property with a cost or fair market value of more than $500? If so, provide

| Description of Asset | Date of Transfer | Fair Market Value | Consideration | Relationship of Transferee to |
|----------------------|------------------|-------------------|---------------|-------------------------------|
| N/A | | | | |
| | | | | |
| | | | | |
| | | | | |

## INTEREST IN OR BENEFICIARY OF ESTATE OR TRUST - Are you or will you become a beneficiary of any estate or trust? If yes, please also furnish a copy of the instrument creating the

| Name of Trust or Estate | Present Value | Value of Your Interest | Annual Income Received |
|-------------------------|---------------|------------------------|------------------------|
| N/A | | | |
| | | | |
| | | | |

| MONTHLY | | | NECESSARY MONTHLY EXPENSES | |
|---|---|---|---|---|
| DEFENDANT | GROSS | NET | Rent or Mortgage | $ 1650 |
| Salary/Wages | 3000.⁰⁰ –cui | | Groceries (No. Of people   1  )   500 | |
| Commissions | per Atty. Coffey | | Utilities   -   Electric        100 | |
| | | | Heating Oil/Gas    100 | |
| Interest/Dividends | | | Water/Sewer   25 | |
| Rental Income | | | Telephone  75 | |
| | | | Cable | |
| Alimony/Child Support | | | Transportation        400 | |
| Social Security | | | Insurance  -Auto        60 | |
| Pensions/Annuities | | | Health | |
| Gifts | | | Homeowners/Rental | |
| Other (specify) | | | Life | |
| SPOUSE | GROSS | NET | Clothing    100 | |
| Salary/Wages | | | Alimony/Child Support (**Must provide** | |
| Commissions | | | Minimum Installment Payments | |
| Business Income | | | Other (specify) - | |
| Interest/Dividends | | | Internet    100 | |
| Rental Income | | | | |
| Alimony/Child Support | | | | |
| Social Security | | | | |
| Pensions/Annuities | | | | |
| Gifts | | | | |
| Other (Specify) | | | | |
| TOTALS | | | TOTALS        2960 | |

**<u>YOU MUST PROVIDE DOCUMENTATION TO VERIFY ALL EXPENSES CLAIMED.</u>**

Where did you deposit and/or spend your illegal gains and profits?

Name bank(s), account name(s), and account number(s) where illegal gains and profits were deposited and spent.

Are you the grantor or donor of any trust, or the trustee or fiduciary for any trust?  If yes, please furnish a copy of the instrument creating the trust.  Also give the present value of corpus of trust, and any other pertinent information.

N/A

Do you receive, or under any circumstances expect to receive, benefits from a claim for compensation or damages, life insurance, legal claim, or from a contingent or future interest in property of any kind (I.e. inheritance, profit-sharing or PENSION PLAN)? If so, explain.

N/A Arum

Are you or have you ever been involved in bankruptcy proceedings? If so, give date, jurisdiction, case number, and status.

No

Have you ever been a party to any civil suit? If so, give date, legal jurisdiction, persons involved and explain.

Debt?

What is the prospect of an increase in value of assets or in present income (Please give a general statement)?

Hopefully the sentencing will not effect my position which also requires the ability to travel. If given this ability, my income will rise.

+++++List any and all personal property you own directly or indirectly, individually or jointly with others, corporate or otherwise, with an approximate fair market value of $500.00 or greater. Describe in detail on Attachment A.

| CERTIFICATION |
| --- |
| I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true, correct, and complete, and I further declare that I have no assets, owned either directly or indirectly, or income of any nature other than as shown in this statement, including any attachment. |

12/30/16

Signature                              Social Security Number              Date
RAYMOND WU

| WARNING |
| --- |

**False statements are punishable up to five years imprisonment, a fine of $250,000, or both (18 U.S.C. Section 1001).**

ATTACHMENT A

LIST ALL PERSONAL PROPERTY YOU OWN DIRECTLY OR INDIRECTLY, INDIVIDUALLY OR JOINTLY WITH OTHERS, CORPORATE OR OTHERWISE, WITH AN APPROXIMATE FAIR MARKET VALUE OF $500 OR GREATER:

| Item | Description | Location | Owner | Year Purchased | Original Price |
|---|---|---|---|---|---|
| Furniture | Couch, Bedroom, Desk | S Michigan Ave | Me | 2007 | 5000 |
| Furniture | | | | | |
| Furniture | | | | | |
| Furniture | | | | | |
| Furniture | | | | | |
| Television | | | | | |
| Television | | | | | |
| Television | | | | | |
| VCR | | | | | |
| Camera | | | | | |
| Video Recorder | | | | | |
| Stereo/CD Player | | | | | |
| Electronic Equipment | | | | | |

| Item | Description | Location | Owner | Year Purchased | Original Price |
|---|---|---|---|---|---|
| Guns | | | | | |
| Jewelry | | | | | |
| Jewelry | | | | | |
| Jewelry | | | | | |
| Jewelry | | | | | |
| Furs | | | | | |
| Antiques | Family Heirloom | S Michigan Ave | Me | Gift | Unknown. FMV 10( |
| Antiques | | | | | |
| Antiques | | | | | |
| Precious Items | | | | | |
| Collectibles | | | | | |
| Collectibles | | | | | |
| Coins/ Stamps | | | | | |
| Artwork | | | | | |
| Artwork | | | | | |
| Computers | Laptop | S Michigan | Me | 2013 | 1200 |
| Computers | | | | | |
| Answering Machine | | | | | |
| Tools | | | | | |

| Item | Description | Location | Owner | Year Purchased | Original Price |
|---|---|---|---|---|---|
| Tools | | | | | |
| Tools | | | | | |
| Aircraft | | | | | |
| Boats or Water Craft | | | | | |
| Vehicles | | | | | |
| Vehicles | | | | | |
| Vehicles | | | | | |
| Vehicles | | | | | |
| Recreation Vehicles | | | | | |
| Recreation Vehicles | | | | | |
| Satellite TV | | | | | |
| Lawn Mower | | | | | |
| Animals | | | | | |
| Sporting Equipment | | | | | |
| Sporting Equipment | | | | | |
| Sporting Equipment | | | | | |
| Season Tickets | | | | | |

| Item | Description | Location | Owner | Year Purchased | Original Price |
|---|---|---|---|---|---|
| Musical Instruments | Piano | S Michigan | Me | 2000 | 3500 |
| Cell Phone | | | | | |
| Time-Shares | | | | | |
| E-Trade Accounts | | | | | |
| Other | | | | | |

**11:44** ⬈                                    ●●●l LTE 🔋

‹                           **Ray Wu**                           •••

Dec 5, 2018 10:15 AM

 Hi Mrs L  ! What a trip you
are having and we can't wait
to hear all about it. Great
news in that ==Lexington is
going according to plan== and


GOVERNMENT
EXHIBIT
Text
12/5/18

projection. ==They issued the remaining capital call== and I believe you need a few weeks to make that happen so making you aware. ==I have you for a remaining balance of 200k.== This can be increase slightly if you are interested since the return is so healthy.



==They would like the remaining balance before the end of year== but we can push it to after the New Year is needed. If so, you can make a smaller amount to tide them over and make more time to get the remaining situated. All great news and glad we have a successful transaction together! Get home safely and continue your amazing

  

11:44 ⌁                                    ．o̊ıİ LTE 🔋

‹                    **Ray Wu**                    • • •

Dec 5, 2018 5:39 PM

I've bcc you my email to my financial account Manager Evan ███ to initiate a transfer of $250K into my Pensco Acct- how is the current dividend proceeds/reinvested $$ reflected for $100K? 

Also let me know how to direct Pensco for balance $$ call to Lexington 🙏 

## Message

**From: WU, RAYMOND**

---

## Hello

Feb 7, 2019 6:20 PM

---

Hi Tom,

To begin, please know that this is written with my utmost
sincerity and from the bottom of my heart.

I am so so sorry. I am sorry to not have confided in my best
friend. I am sorry that my set of circumstances is effecting
you and others we care about. I am sorry that I did not
disclose my situation where an allegation resulted in an
unexpected turn. the truth is I was ashamed and scared.
This is exponentially pronounced when it comes to you
because of how much I care about and respect you. What
was supposed to be a plea on information turned into a
sentence with very limited time for me to react. Again, I am
so sorry I did not confide or tell you the exact details when
I really wanted to and needed my best friend's advice. I did
not want you to think less of me albeit me having a valid
position on my side. What you think of me is is very
important to me because I think the world of you.
Furthermore, my excuse for my sabbatical is despicable.
The love and care you showed for me made me feel
terrible and I was a coward for not knowing what to do. I
often tried but never mustered up the decency. You had so
much to deal with (I was catching up and forging ahead)
that I just didn't know what to do. I felt like trash every time
and still do. I do not ask for your forgiveness ever and I
apologize profusely for lying to you. I hope to earn an
inkling of any respect from you in the far distant future
perhaps next lifetime.

GOVERNMENT
EXHIBIT

Email
2/7/19

## Message

In regards to my current situation, what has been presented is one-sided but I am unable to go into details until we can speak. Just please please please know that everything we agreed upon is per that. I did not and never would do otherwise. We have all worked tirelessly and supported one another handling everything. The perspective presented is incorrect. Because of our trust (of which I was dishonorable) we knew we would reconcile once the wins come in.

I am sure you are very busy and hope the hard work is showing promise. The things on my end and E's have been progressing very nicely albeit this situation impeding the process. I need to speak with you to provide all important details and hope they are still in play. To be pragmatic, all of our hard work cannot be let go. I need help to continue my responsibilities on all of our behalf. E is aware of most items but as you know is furious. I have only spoken to here once. In regards to E, I love her to no end. That is the truth. We kept our relationship under wraps but now you can see why after all these years, you never saw me with anyone. That is how loyal I am to her. Now she thinks the worst and I do not know what to do. Please help in any way you can to open up her heart. She must be so scared. Her and you sadden me the most about everything in addition to her family and my other friends. This is what's most important to me. I don't even care about myself.

I will need to end this message for now but will try to communicate again via email or phone. Please let me know that this was received.

I am humiliated for letting you down and not treating you like my best unconditional best friend. I realize my mistake but it was never my pride especially with you. I was scared and cowardly that you would think less of me; in which case I am sure you now do. Please know that I am not what is cast. I just am not. I ask for one singular time for us to meet where I will be completely transparent with no filter. Also, thank you again for your grace at my CA bond hearing. Your gesture later brought me to tears and honestly there have been many because I am effecting and putting in pain whom I love.

Your former best friend, Ray

**From:** Francis Lipuma
**Sent:** Friday, February 08, 2019 2:35 PM
**To:** Stern, Jacqueline (USAILN)
**Subject:** Re: [Raymond Wu's Sister]

Yes, it is my understanding that Raymond owes [his sister] and her husband a large sum of money, but I can't give you a specific amount. The couple took out a HELOC in the amount of approximately $50,000 and gave it to Raymond as he requested because he was purportedly in financial distress as a consequence of his divorce. In the emails we provided to you today, you will see correspondence between [Wu's brother-in-law] and Raymond in which various debts are discussed, including the funds relating to the HELOC. Even though Raymond promised to pay back the money, he did not, and then [Wu's sister] and her husband had to liquidate their retirement accounts in order to pay off the HELOC.



GOVERNMENT EXHIBIT

Email re Wu's Sister

CARDELS 800-783-0399