IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18 CR 852 |
| v. | ) | |
| | ) | Honorable Rebecca Pallmeyer |
| RAYMOND WU | ) | |

## DEFENDANT WU'S SENTENCING MEMORANDUM

Defendant RAYMOND WU, by the Federal Defender Program and its attorney, DANIEL HESLER, respectfully submits the following memorandum outlining potentially relevant sentencing factors. Mr. Wu has lied, omitted important things, and misled others, but he is trying to be better than he was. The totality of the circumstances in this case suggest that a sentence of 36 months custody, followed by a term of supervised release, would be sufficient for the purposes of sentencing. The defendant further states as follows:

## I.    Background

Raymond Wu tried to live an entrepreneurial life. He grew up the eldest child of hardworking Chinese immigrants in Chicago. As a teenager, he worked after school and weekends in a family-owned restaurant on the south side of Chicago. When he was in college, he ran a housepainting business. After graduation, he worked for a management consulting firm for about three years, and then worked for a similar company for about three years after that. Eventually, he started doing management and business consulting on his own, starting around 2007. Since then, his plan was to work with investors and companies not in a passive role, but as someone who could help startups find investors

and investors find startups, and as someone who could help companies succeed. As is the case with businesses in general, some of the projects that he worked on succeeded, some came close, and some of the projects failed. For examples of success, in the last year, based on work that he did before this arrest, Ray Wu was listed as the executive producer on two different movies that apparently have done very well streaming on Netflix.[1]

Mr. Wu's character is a combination of things, both good and bad. He is amiable, polite, and industrious. At the same time, he has had a habit of saying what people want to hear, and not saying what they do not want to hear, even at the expense of the truth. He wanted to look successful. The combination of these traits contributed to him making a lot of false statements that were material to people who entrusted him with their money. The government already has and will undoubtedly tell this Court again about many of those false statements. Among the most egregious were that when he was prosecuted in Milwaukee for a fraud offense and sentenced to a year and a day in custody, he admitted that to almost no one. Instead, he provided various stories about where he would be; either travelling to China for cancer treatments, or travelling overseas for business. Although his intent was to make all of the projects work out for everyone he was

---

[1] If the Court is wondering if Mr. Wu therefore made money off of these projects, the answer would be probably not, although Mr. Wu does not know. Because he has followed his bond conditions and stayed away from everything about his old life, he has no idea what is going on with anything. But screen shots of "Charming" and "Dog Gone Trouble" both list Ray Wu as an executive producer. *See* Exhibit A. (These screen shots were retrieved independently of Mr. Wu, and have been slightly redacted.) Both movies were streaming in 2021, and Dog Gone Trouble in particular seems to have done quite well in streaming. If Mr. Wu does receive any money on anything, it will go towards restitution.

involved in, he was not fully honest with anyone. He moved around money to try make everything work, and said whatever needed to be said at the time, depending on the situation. There was no single pattern of conduct, or misconduct, that was followed. Mr. Wu knows that what he did was wrong, has pled guilty, is doing what he can to pay back what he can, and understands that he is facing a custodial sentence for his actions.

## II.    The Guidelines

### A.  The offense level

The following summarizes the offense level calculations from the PSR, and clarifies which portions are contested by the defense:

| | | |
|---|---|---|
| Base offense level    (§2B1.1(a)(1)) | 7 | (not contested) |
| Loss > $1.5 million (§2B1.1(b)(1)(I)) | + 16 | (not contested) |
| More than 10 victims (§2B1.1(b)(2)) | + 2 | (not contested) |
| Sophisticated means (§2B1.1(b)(2)(A)) | + 2 | (not contested) |
| Abuse of trust (§3B1.3) | + 2 | (not contested) |
| Commission of Offense while on bond (§3C1.3) | + 3 | (disputed) |
| Acceptance of Responsibility (§3E1.1) | - 3 | |
| **Total** (without the disputed levels) | **26** | |

Mostly, the defense is not challenging the offense level calculation in the PSR. The exception to this for the adjustment under §3C1.3. *See* PSR at 9. The defense submitted a lengthy and detailed objection to that enhancement in April of 2021. *See* ECF #96. The prosecution has not responded to that objection, and it seems unlikely that there

will be a meritorious response. In summary, the three level enhancement from §3C1.3 cannot apply in this case because, under the principles of *Apprendi v. New Jersey,* 530 U.S. 266 (2000), the ten year statutory enhancement from 18 U.S.C. §3147 cannot apply if the §3147 allegations are not charged in the indictment and pled to, and under the crystal-clear text of USSG §3C1.3, the three levels under §3C1.3 only apply if the §3147 statutory enhancement applies. Thus, the three levels under §3C1.3 are inapplicable in this case.[2] Mr. Wu's offense level is level 26.

**B. The criminal history category**

The PSR puts Mr. Wu in criminal history category III. To begin with, the defense agrees that the PSR accurately outlines Mr. Wu's prior convictions. He has a grand total of one prior arrest, related to one prior conviction. *See* PSR at 10. However, it is the defendant's position that Mr. Wu is actually in criminal history category I instead of III.

The defense position results from the observation that the conduct from the Milwaukee case falls within the relevant conduct of this case. The government has alleged a scheme to defraud running from about January of 2009 until December of 2018. *See* Indictment (ECF #12); *see also* Gov. Ver. of the offense (attached to the PSR) at 5. There is no unifying factor in this scheme other than Mr. Wu and false statements. Each victim alleged presents a different situation. Some invested with or through Mr. Wu, some hired him to perform services (including creating marketing materials and websites) in exchange for payments or a share of their companies, and some loaned him money.

---

[2] This description of the §3C1.3 argument is only a summary. It does not replace the nine pages of analysis that was submitted in ECF #96.

An argument could be made that the various parts of this conduct, involving different people, disparate business arrangements, different locations, and a time span of nearly a decade, do not make one common scheme or plan, and so some of the losses should not properly be considered relevant conduct in this case. The defense is <u>not</u> making that argument. Mr. Wu had a habit of saying what was situationally expedient, the government is trying to hold him accountable for everything since 2009, and Mr. Wu is agreeing. He is accepting responsibility for the totality of his conduct. So, the defense has considered and is not challenging that all of the losses alleged can properly be considered by this Court, nor is any challenge being made to the fact that some of the losses are quite old, and arguably might not fall within the statute of limitations.

What logically goes along with that, however, is the fact that Mr. Wu's conduct in the Milwaukee case was also part of his same pattern of wheeling and dealing, of saying whatever was convenient, and of moving money around in questionable ways. It also falls within the same time period as the conduct alleged as relevant conduct by the government and the PSR.[3] There is no principled way in which Mr. Wu's conduct that was charged in the Milwaukee case can be considered one scheme, and everything else he did in between 2009 and 2018 is another. Either these are many separate schemes, or

---

[3] *See* PSR at 10. The indictment in the Milwaukee case, E.D. Wis. Case 15 CR 33, charged four counts of wire fraud occurring between December 2009 and December 2010, with the relevant wire transactions all occurring in 2010.

simply one scheme. The government has chosen to treat everything Ray Wu has done since 2009 as one scheme, and the defense is agreeing.[4]

There are three consequences of treating all of Mr. Wu's conduct since 2009 as one common scheme, rather than multiple schemes. One is that his loss amount, which the PSR calculates at $1,539,513, should be increased by about $317,000 to account for the Milwaukee conduct. *See* PSR at page 10. The resulting total is still far under $3.5 million, and so the guideline level does not change. The second is that if the Milwaukee case is considered relevant conduct to this case, then that conviction does not count for criminal history purposes. *See* USSG §4A1.2(a)(1) and application note 1. *See also United States v. Garecht,* 183 F.3d 671 (7th Cir. 1999); *United States v. Morales,* 655 F.3d 608, 642-44 (7th Cir. 2011). Moreover, according to the (unpublished) Seventh Circuit case of *United States v. Trudelle,* 134 Fed. Appx. 953 (7th Cir., June 2 2005), the two criminal history points for committing this offense while under a criminal justice sentence (under §4A1.1(d)) also do not count if the criminal justice sentence was for

---

[4] Additionally, the defense is aware that if it were successful in challenging that some parts of the conduct alleged are not part of a common scheme or plan with other parts, the government might be justified in recharging in a separate indictment any excluded parts that were not barred by the statute of limitations. That could leave Mr. Wu in a position of facing additional sentencings, despite the fact that this Court would sentence Mr. Wu with a §3553 awareness of all of his uncharged conduct. Another reason why no relevant conduct challenge is being made is that Mr. Wu is trying to make a break with his old life, fully admit his transgressions, accept his punishment, make actual changes in his character and habits, and try to atone for his past. It would feel incongruent to make the legal argument that some of this conduct is not relevant conduct while asserting that Mr. Wu is fully accepting responsibility for his actions. The defense is choosing to embrace acceptance. For all these reasons, Mr. Wu is agreeing with the government and the PSR that he should be sentenced for everything from 2009 to 2018.

conduct that is part of the instant offense. *Id.* at **2. The reason for this is that application note 4 to §4A1.1 requires that the underlying conviction to be a countable conviction for the two points under §4A1.1(d) to apply. What that leaves Mr. Wu with is zero criminal history points, and a criminal history category I. The defense will concede that this Court can and undoubtedly will take into consideration the fact that Mr. Wu went through a prosecution, plea, and sentencing in Milwaukee, and did so badly. But as a guidelines matter, he is in criminal history category I. The third effect of recognizing that this is all one long-running scheme is that, as a §3553 matter, this Court can and should consider that Mr. Wu has already served a year and a day of time for conduct that is relevant conduct to this case. This will be discussed below.

Thus, with a total offense level of 26 and a criminal history category of I, Mr. Wu's properly calculated guideline range is 63 to 78 months.

### III. The §3553 factors in this case

#### A. The legal framework for sentencing

This Court is well aware of the post-*Booker* legal framework for sentencing. Under 18 U.S.C. §3553, this Court is required to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]…." The question, as always, is what sentence will be sufficient for Mr. Wu's individual case.

#### B. There are mitigating factors in Mr. Wu's conduct that the court can consider.

This argument needs to be bookended by some major concessions. Ray Wu told a lot of lies to a lot of people over a long period of time. And Mr. Wu recognizes that those lies were consequential. Mr. Wu's actions hurt people. Many of the people listed as

victims were Mr. Wu's friends, relatives, and people he cared about. They trusted Ray Wu, and he abused that trust. They lost money. Worst of all, Mr. Wu's girlfriend of several years committed suicide while he was in custody, in March of 2019. That is a loss for which there is no such thing as restitution. Mr. Wu is sorry for everything, but he knows that words can never be enough. Ray knows that his past actions mean that no one will, or even perhaps should, accept his word for much of anything. He is trying to earn his way back into the world, but he knows that no one involved in this case is likely to accept that yet. All he can say is that he is sorry, and try to show that, one day at a time.

That being said, there are fraud offenses where it is clear that, from the outset, the intent of the perpetrator is to swindle the victims. This does not describe Ray Wu. His plan was generally to work with people and make their projects succeed. If the Court is dubious of Ray Wu's intentions, consider this. Many of the victims were old friends, family members, and even his future in-laws. Several of them had met his parents. There was no indication that Ray had any plan to take anyone's money and then disappear. It makes little sense to swindle people you cannot run away from.

Ray's hope was that eventually the projects would be successful, he would pay all his debts, and everyone would be happy. That did not happen. Although he may never be involved in business dealings again, he now accepts the fundamental lesson of the federal fraud statutes: if you are handling other people's money, you cannot lie. It does not matter if one hopes or believes that ultimately things will work out well. The credo of "fake it until you make it," which has some validity in some aspects of life, is not

acceptable when one is entrusted with other people's money. Good intentions do not excuse lying.

With those concessions clearly made, Ray generally did have good intentions. Some of the oldest conduct alleged is that Mr. Wu borrowed money and then did not pay back on the schedule that he had promised. *See* gov. ver at 7. But he did continue to make payments, even years later. *See* gov. ver at 11, 26. Most significantly, however, is the fact that he worked hard to make the various projects work. He also spent significant amounts of money on the projects themselves. The government seems to be treating all money that Mr. Wu spent on hotels, meals, and travel as personal expenditures. As discussed above, the defense is not contesting the government's calculations, but there is a caveat to consider. When the projects involving trying to sell his clients' projects to others, the way that is done is by travelling to businesses and conferences and networking with people in the relevant industries. That networking was part of the service that Mr. Wu was selling to his clients, and he was doing that work. Partly because the records are incomplete,[5] and Mr. Wu hopelessly intertwined every project that he worked on with

---

[5] The records the defense has are incomplete. Mr. Wu had multiple email accounts, and was involved in multiple companies. The government obtained some, but no where near all of those records. Several key email accounts became inactive when Mr. Wu was arrested, and later attempts by the defense counsel to recover those records were unsuccessful. With all of those records, it might (or might not) have been possible to reconstruct where every dollar was spent and why, for better or worse. The defense is not saying that those records would clear Mr. Wu; they would not. Ray Wu lied a lot. But the combination of the complexity and interconnectedness of all this financial activity along with the incomplete record makes it impossible to make any precise calculation of what was and what was not a legitimate business expense in this case. In an effort to embrace acceptance of responsibility, the defense is simply accepting the government's loss figures.

every other project, the defense is not challenging the dollar figures asserted by the government as loss amounts. The fact that Mr. Wu made material misstatements of fact to everyone involved that would have affected their decisions whether to trust him with their money in the first place means that the conduct is properly considered fraud, and if the victims did not get their money back, it is loss. But the defense does assert that some portion of the money that is considered loss was spent trying to accomplish the goals that the investors wanted Mr. Wu to accomplish. It is the defense's hope that as a §3553 consideration, this Court can take that into account.

**C.      Mr. Wu's conduct since April of 2019 is everything a Court could hope for from a person in Mr. Wu's position.**

Ray Wu has now been out on bond for almost two and a half years. There are multiple reasons for the lengthy term on bond; he could no longer afford private counsel, the facts of this case are ridiculously complicated, and a pandemic devastated the world as we knew it. Very few of the reasons for that delay have been in his control. Nevertheless, two and a half years is a while. It is enough time to either demonstrate character, or begin to change it.

Ray's performance on bond has been impeccable. There have been no violation reports from Pretrial Services whatsoever. When Mr. Wu was initially released to home incarceration, he stayed in his parent's house as he was directed. He tried to use his time as well as he could. He took on every project he could in his parents' home, including repairing walls and floors and repainting nearly the entire home. He was and still is helping his parents with everything he can, including cleaning and cooking. When he was

eventually allowed to seek employment after about six months, he found and took two jobs. One of his jobs was at a Whole Foods, bagging groceries and retrieving shopping carts. *See* PSR at 15. He did that until the pandemic; as someone living with elderly parents, in 2020 he did not want to work a job involving that degree of contact with people. He also started the other job referenced in the PSR at page 15. He is still working there. He has worked checking coats, scanning tickets, assisting the disabled, and handling customer service projects. He sometimes guides tours. He typically works 40 plus hours per week, although some of his extra hours he is actually volunteering. He is now earning $17 per hour. His supervisors seemed very pleased with him. Essentially, he has embraced the opportunity to work hard at a job where his hard work and people skills are valued, while not presenting any risk of him getting into any new trouble.

Mr. Wu has also done everything else asked of him. He has come to every court appearance as required. Despite the government's dire predictions, he travelled to California, closed out his storage unit, and returned. He has paid $100 each month towards the restitution from his Milwaukee case. Moreover, he recently received notice that a casino was trying to refund $9,500 to him. He has notified pretrial, the court, and the government of that, and is in the process of collecting that money to be promptly turned over to be used for restitution. (Reportedly, it is in progress. He hopes it will be complete before the sentencing.) Additionally, he is agreeing that some funds that were seized by the government early on should also be returned to the victims. He will also be submitting a letter to Court expressing his remorse, but he understands that in a case like this, actions mean much more than words.

Ray Wu has a lot to make amends for, but everything he has done within the last 29 months is consistent with a real effort to be what he should be. He has followed the instructions of the Court and pretrial, avoided all contact with victims or witnesses, done nothing financially, worked, continued to make payments as directed from the Milwaukee case, and tried to be a good son to his aging parents. If people can change (and they can), and if what we have done recently means more than what we have done in the more remote past (and it does), then there are significant indications that Ray Wu may not require the kind of punishment the government is seeking in order to be someone who can function lawfully in society.

**D.    In a few different ways, Mr. Wu has already been punished for this offense.**

Mr. Wu engaged in fraud between 2009 and 2018. This is not good. However, as discussed above (at page 4-7), the conduct that was prosecuted in Milwaukee was a subset of that larger fraud scheme, and he has already served a year and a day in federal custody for that conduct. Clearly, he did not learn the lessons that he should have from that experience, and that is something this Court will take into account. Nevertheless, that is one year that he has already spent in custody for part of the fraud that he committed during the relevant time period. Under 18 U.S.C. §3585(b), the BOP will not credit him for that year. Therefore, it makes sense for this Court to conceptually decide what sentence Mr. Wu deserves, subtract a year from that, and then impose that sentence. As a hypothetical, if this Court were thinking that a four-year sentence were the right sentence for this offense, a 36 month sentence would effectively impose that.

Additionally, Mr. Wu has also spent almost two and a half years on bond under fairly rigorous conditions. *See generally*, ECF # 41, 57, 71, & 87. Between April 3, 2019, and October 11, 2019, he was on strict home incarceration. From October 11, 2019, until February 18, 2020, he was allowed to leave the house only for employment purposes. On February 18, 2020, his bond was modified to curfew status, but that still meant that he was confined to his parents' townhome around half the time. His curfew and EM restrictions were removed on October 15, 2020. He had spent over 18 months primarily confined to his parent's home.

The defense does not argue that time spent on home incarceration or home detention or curfew is the same as custody. It isn't, and the BOP does not count such time as anything at all. Nevertheless, in a §3553 calculus, this Court can and should consider that Mr. Wu has already experienced a dramatic reduction in his liberty for a period of years as a consequence for this offense. The Court may choose to weigh that as a factor in deciding what sentence is necessary in this matter.

**E.      The proposed conditions of supervised release are acceptable.**

The conditions of supervised release proposed in the PSR are acceptable. Mr. Wu will accept whatever conditions the Court imposes.

## Conclusion

The government has taken a consistent position throughout this case. It is that Ray Wu is evil incarnate, and will lie, cheat, flee, and absolutely anything else in service of himself. Whether or not the government's ire is justified, it is certainly not supported by

anything that has happened since April of 2019. Since his release on bond, Mr. Wu has done everything he could to be what he should be. That does not erase his prior wrongs. But he has followed all the rules, and done what he said he would, and made restitution payments, and taken care of his elderly parents, and worked hard at jobs where there is no potential for malfeasance. In short, Mr. Wu seems to be living the way society wants him to. This is an indication that the full weight of the guidelines might not be necessary here.

This is not to argue that Ray Wu should not be punished. He has much to atone for. But Mr. Wu is starting by accepting responsibility for the lies that he told, the money he diverted, and all the hurt he has caused. All he asks is that the Court see him not as the heartless con man the government believes he is. He is, like many people, flawed. His childhood habit of wanting to please his parents and teachers morphed into a habit of telling people what they wanted to hear. Any disappointing news, he hid. Instead, he led people to believe that he was more successful than he was, and that the monies they entrusted him with were going to magically and perfectly multiply. The problem is that those things were not true. He lied. His lies hurt everyone around him.

He is trying to do better. It starts with a recognition of his own failings. He is working on that. Mr. Wu has been participating in counseling for the past eight months or so. He sought this out on his own. Among the issues that he has been try to address are the causes of his own self-sabotage, along with his overwhelming feelings of guilt, grief, and loss. That may not be enough, but along with efforts to do better, it is a start.

Taking everything into account, including his history of dishonesty, and more recently several years of sustained exemplary conduct, a sentence of 36 months would be

sufficient for society's purposes. It is a substantial custodial sentence, and three times longer than what he received previously, but it does not involve simply throwing Mr. Wu away. There are too many positive indications for that to be the right answer in this case.

For all these reasons, Mr. Wu should be punished, but that punishment need not be excessive. It is respectfully suggested that a sentence of 36 months custody, followed by three years of supervised release, along with an order of restitution, would be sufficient in this case.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: *s/ Daniel J. Hesler*
    Daniel J. Hesler

DANIEL J. HESLER
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, IL 60603
(312) 621-8347

## CERTIFICATE OF SERVICE

The undersigned, Daniel J. Hesler, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## DEFENDANT WU'S SENTENCING MEMORANDUM

was served pursuant to the district courts ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>September 15, 2021</u> to counsel/parties that are non-ECF filers.

By: <u>s/ Daniel J. Hesler</u>
Daniel J. Hesler

DANIEL J. HESLER
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, IL 60603
(312) 621-8347

Exhibit A

Screen Shots from
Charming and Dog Gone Trouble
(redacted)



