UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | No. 18 CR 852 |
| v. | |
| | Chief Judge Rebecca R. Pallmeyer |
| RAYMOND WU | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully recommends that the Court accept the findings and calculations in the Presentence Investigation Report (PSR) and sentence defendant Raymond Wu to a Guidelines sentence.

## I.    STATEMENT OF FACTS

The PSR, including the Government's Version of the Offense, accurately summarizes the facts and circumstances material to the defendant's offense of conviction.  R. 95.  Defendant does not meaningfully contest those facts; his interpretations of those facts in light of the Guidelines and 18 U.S.C. § 3553(a) sentencing factors are addressed in sections II and III below.

Defendant defrauded twelve victims of over $1.5 million by convincing them that he was a legitimate consultant and financial adviser, when in reality he was misappropriating their money for his own benefit.  Defendant presented himself as enormously successful, and once he was entrusted as a consultant/financial advisor, he diverted the victims' funds towards plane tickets, luxury hotels, car payments,

cash withdrawals, and other personal expenses that bolstered his image as a successful businessman. He was no such thing. Defendant told victims that their money would go towards developing their own startup companies or investing in companies and funds that would provide a significant return on investment. Instead, he used the money on himself and to perpetuate the scheme, including by making Ponzi payments to other victims.

Most victims were family members or close friends, located in Illinois and California. In many instances defendant used the same companies—those of clients, those he claimed to be investing client funds in, and his own—to defraud his victims. Victim 1[1] and Victim 8 were both sold lies related to the company C.D. In Victim 8's case, money he thought was being invested in C.D. was actually directed to Victims 11 and 12 to repay a loan secured by a condo that never existed. Victims 11 and 12 were themselves swindled into making investments into companies L.B. and L.F. The funds were actually taken by defendant.

This interlinking of frauds was a defining feature of the scheme. Defendant told Victim 4 to send money to company G.G., the company of Victims 2, 3, and 7. Defendant then convinced Victims 2, 3, and 7 to give defendant that money to pay vendor fees for G.G.; defendant instead misappropriated the funds. For all of these victims, defendant convinced them that he was a legitimate consultant and investment advisor, sometimes—as for Victims 5, 6, 9, and 10—convincing them to

---

[1] Victims are referred to in this memo by the number attributed to them in the Government's Version Loss Summary at page 78 of the PSR (R. 95).

2

invest directly in or through his consultancy/investment companies Wunderkind and Five Fold Equity.

Defendant sought to conceal his scheme, including by lying to victims about his whereabouts. In January 2017, Defendant reported to prison to serve a one-year sentence for a conviction in a different fraud case in Milwaukee, Wisconsin. Instead of admitting he was going to prison for committing fraud, defendant told Victims 4, 5, 6, 11, and 12 that he was going on a business tour of multiple countries and would be unreachable. He told Victim 8 that he was going to China for cancer treatment. These lies served the same purpose: to conceal the Milwaukee conviction and allow him to continue his fraud. While defendant did not have a true accomplice, he did use an unwitting one: Victim 13[2]. Defendant used her to defraud Victims 1, 4, 5, 6, 8, 9, 10, 11, and 12, including by communicating with those victims while defendant was in prison.

## II.    CALCULATION OF GUIDELINES SENTENCE

The PSR accurately calculates defendants' offense level and criminal history category at 29 and III. His Guidelines imprisonment range is 108 to 135 months.

### A. Guidelines Calculations

Defendant's base offense level for violating 18 U.S.C. § 1343 is seven. He receives a sixteen point upward adjustment for a loss amount exceeding $1.5 million. He receives additional two-point upward adjustments for employing sophisticated means and for abusing a position of private trust. Defendant does not

---

[2] Victim 13 refers to the person discussed in the Government's Version at page 39. R. 96.

challenge these calculations, nor the three points that are deducted for acceptance of responsibility. Defendant does object to the three-point upward adjustment he receives for committing the instant offense while on release under USSG § 3C1.3. He also argues that his criminal history category should be I instead of III because he argues his sentence for a prior violation of 18 U.S.C. § 1343 should not count as a prior sentence. These arguments are addressed in subsections II.B and II.C below.

## B. USSG § 3C1.3

Defendant objects to the application of USSG § 3C1.3, which imposes a three offense-level upward adjustment for committing the offense while on release. He argues that because he was not charged with and convicted of 18 U.S.C. § 3147, USSG § 3C1.3 should not apply to him.

USSG § 3C1.3 reads: "If a statutory enhancement under 18 U.S.C. § 3147 applies, increase the offense level by 3 levels." The background note in the commentary to § 3C1.3 reads: "An enhancement under 18 U.S.C. § 3147 applies, after appropriate sentencing notice, when a defendant is sentenced for an offense committed while released in connection with another federal offense."

Indeed, 18 U.S.C. § 3147 imposes a statutory sentencing enhancement based on that conduct:

> A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense, to—
>
> (1) a term of imprisonment of not more than ten years if the offense is a felony; or
> (2) a term of imprisonment of not more than one year if the offense is a misdemeanor.

4

A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment.

Ignoring the commentary to USSG § 3C1.4 and the Guidelines' common practice of using statutory offenses to define conduct that triggers a Guidelines adjustment, defendant argues that because he was not charged with violating 18 U.S.C. § 3147 (and is therefore not subject to a consecutive sentence for committing an offense while on release), he should escape the Guidelines as well as the statute. But whether or not § 3147 was charged, it undoubtedly applies to defendant's conduct.

The speed limit applies if a driver goes 40 in a 25, whether or not the driver is given a ticket for speeding. The officer that pulled the driver over might use her discretion to give him a written warning instead of a ticket, but it would be wrong to say that the speed limit did not apply to his violation for that reason. Wu, receiving a lesser sanction than he admits he could have received,[3] asks this Court to say that the lesser sanction is illegitimate because the officer did not give Wu a ticket. The government could have charged and convicted Wu with a violation of 18 U.S.C. § 3147 for committing an offense while on release, but the fact that the government did not does not mean that § 3147 does not apply to his conduct.

Defendant engages in an extended discussion of *Apprendi*. R. 96, pp. 3–4. *Apprendi* is totally inapplicable to defendant. Neither the PSR nor the government proposes that defendant's statutory penalties should be increased under 18 U.S.C.

---

[3] Wu writes that "There was an overlap between this case and his tenure on bond in the Milwaukee case." R. 96, p. 5.

§ 3147, only that defendant's Guidelines range should be increased under USSG § 3C1.3. The Guidelines, of course, are wholly advisory and do not implicate a defendant's jury rights or *Apprendi*.

Defendant's focus on *Apprendi* is in service of his larger argument that in cases where 18 U.S.C. § 3147 is not charged and its statutory penalties are not imposed, USSG § 3C1.3's upward Guidelines adjustment can also not be imposed. But the Seventh Circuit has upheld district courts' application of § 3C1.3 in cases where § 3147 was not charged. *See United States v. Marcotte*, 835 F.3d 652, 657 (7th Cir. 2016); *United States v. Sturman*, 49 F.3d 1275, 1283 (7th Cir. 1995). The Seventh Circuit has actually chastised the government for not applying the § 3C1.3 enhancement when § 3147 is not charged. In *United States v. Rigsby*, 501 Fed.Appx. 545, 550 (7th Cir. 2013), the court upheld an above-Guidelines sentence and took the government to task for not applying § 3C1.3:

> [F]or completeness we note that the degree to which Rigsby's prison sentence exceeds the guidelines range is greatly exaggerated because the government inexplicably agreed to an artificially low calculation of Rigsby's total offense level . . . . Rigsby committed a crime during his release—bail jumping, in violation of 18 U.S.C. § 3146—but the government apparently overlooked the three-level increase that should have resulted. *See* U.S.S.G. § 3C1.3; [and citing cases applying § 3C1.3].

*Rigsby*'s logic is clear: § 3C1.3 should have been applied even though § 3147 was not charged. What matters is not if the defendant is convicted under § 3147, but if the defendant engaged in the conduct that § 3147 prohibits.

There is no support for defendant's interpretation of § 3C1.3 in the Seventh Circuit, and scant support elsewhere in the federal courts. Defendant quotes

extensively from an unreported Western District of Virginia case, *United States v. Lawson*, 2002 WL 992369 (May 9, 2002), which in conclusory fashion adopted the logic that defendant puts before the Court. Defendant admits that *Lawson* is an out-of-circuit, District Court case, and therefore not controlling. R. 96, p. 8. *Lawson* is also from 2002. Amendment 734 to the Guidelines in 2009 did not substantively change the Guideline for Committing an Offense While on Release, but it did simplify the language of both the enhancement and the commentary in a way that makes the focus on conduct clearer.[4] As noted, the current version of the enhancement begins "If a statutory sentencing enhancement under 18 U.S.C. § 3147 applies . . . ." And the commentary defines that requirement by stating "An enhancement under 18 U.S.C. § 3147 applies, after appropriate sentencing notice, when a defendant is sentenced for an offense committed while released in connection with another federal offense."

Amendment 734 states in its "Reason for Amendment" that "Section 3C1.3 (formerly §2J1.7 . . . ) provides a three-level adjustment if the defendant is subject to the statutory enhancement at 18 U.S.C. § 3147—that is, if the defendant has committed the underlying offense while on release." This is another way to understand how the Commission intended the Guideline to be interpreted.

---

[4] In 2002, § 2J1.7, the section that was subsequently relabeled as § 3C1.3, read: "If an enhancement under 18 U.S.C. § 3147 applies, add 3 levels to the offense level for the offense committed while on release as if this section were a specific offense characteristic contained in the offense guideline for the offense committed while on release." The background note in the commentary read: "An enhancement under 18 U.S.C. § 3147 may be imposed only after sufficient notice to the defendant by the government or the court, and applies only in the case of a conviction for a federal offense that is committed while on release on another federal charge."

"Applies" is another way of saying "is subject to." Whether or not a defendant is charged with violating § 3147, he is still "subject to" it if he has committed the underlying offense while on release.

The Seventh Circuit has not addressed defendant's argument specifically, and few courts have had the opportunity to address it at all. One of the most persuasive treatments comes from the Fifth Circuit, agreeing with the First Circuit that § 3C1.3 applies when § 3147 is uncharged:

> On Simpson's reading, section 3C1.3 cannot be used to enhance a sentence unless section 3147 is constitutional under *Apprendi* and *Alleyne*. This, however, is a misreading of the Guidelines provision. As the First Circuit explained in *United States v. Randall*, 287 F.3d 27 (1st Cir. 2002), a reference in the Guidelines to a criminal statute may be used to identify conduct that triggers a Guidelines provision without making a "conviction" or other adjudication under the statute a prerequisite for deploying the provision.

*United States v. Simpson*, 682 Fed.Appx. 299, 303 (5th Cir. 2017).

Defendant in his argument to the contrary, states that "The sentencing commission could have written this provision to say 'if the offense of conviction was committed while the defendant was on bond in any other case, increase the offense level by 3 levels.'" R. 96, p. 5. This ignores both that the commentary effectively does lay out what defendant suggests, and also the obvious concision benefit of using a statute to define conduct rather than writing out the conduct in the Guideline itself. That benefit is not present in the converse consideration: Why not say "If a defendant is convicted under 18 U.S.C. § 3147" if that is what the commission meant?

The Simpson court goes on:

8

> Indeed, the language employed by the Guidelines distinguishes between cases in which a conviction under a statute triggers the Guidelines and cases in which the statute is merely cited to identify conduct that activates the Guideline. For example, Guidelines section 2D1.11(2) states, "If the defendant is convicted under 21 U.S.C. 865, increase by 2 levels." Like section 3147, section 865 is not a separate offense but a statutory enhancement. [citation omitted]. The drafters of the Guidelines know how to make a conviction "under" a sentencing statute a predicate for a Guideline but did not do so when writing section 3C1.3. Because the reference in Guidelines section 3C1.3 to the section 3147 statute is meant to identify the conduct that triggers an enhancement, not make the enhancement depend upon a conviction under the statute, the trial court did not err by applying the enhancement for offenses committed while on pretrial release.

*Simpson*, 682 Fed.Appx. at 303.

Defendant writes that the Guidelines almost always "ask courts to make factual findings by the preponderance of the evidence in order to justify guidelines level increases within existing statutory maximums." R. 96, p. 5. Just so. Rather than accepting defendant's invitation to import *Apprendi* into the Guidelines, the Court should read § 3C1.3 as in line with the rest of the Guidelines. This Guideline, like most of its brethren enhancements, defines conduct that increases a defendant's advisory Guidelines range. Defendant admits to the fact that he committed the offense while on release for another federal crime. *Id*. His offense level should be increased by three levels under § 3C1.3.

### C. USSG §§ 4A1.2 and 1B1.3

Defendant argues that his Milwaukee wire fraud conviction is relevant conduct to the instant offense and therefore should not be counted as a prior sentence for purposes of his criminal history score.

The Milwaukee wire fraud is separate from both the charged conduct and the relevant conduct in this case. The government and the PSR are not considering losses attributable to the Milwaukee scheme in calculating defendant's Guidelines. Defendant has already been convicted of the Milwaukee fraud separately. Its only relevance is as part of defendant's criminal history.

Adding the losses from the Milwaukee case to relevant conduct does not increase his loss amount category or offense level, while erasing his prior conviction from his criminal history points decreases his Guidelines from 108–135 months to 87–108 months. Such a conceptualization does not reflect the reality of defendant's conduct.

In the conduct relevant to this case, defendant engaged in a series of interlinking frauds based on the central fiction that he was a consultant/investment advisor with the best interests of his clients at heart. Separately, he convinced the victims in the Milwaukee case to give him money so that defendant could open and operate a frozen yogurt business. Rather than let his conviction and incarceration for the Milwaukee scheme interrupt his consulting fraud, defendant lied to the victims in the present case so he could continue to take their money. His attempt to erase the Milwaukee conviction from his criminal history should be unsuccessful.

USSG 4A1.2(a)(1) reads: "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense." Application note 1. to that Guideline clarifies:

> A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense. Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of §1B1.3 (Relevant Conduct).

USSG §1B1.3 includes as relevant conduct "all acts and omissions committed, aided, abetted, [etc.] . . . by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, [etc.]."

Both the Milwaukee case and this case involved fraud offenses. Because fraud offenses are covered by USSG § 2B1.1, and because § 2B1.1 is included in the grouping section § 3D1.2(d), § 1B1.3(a)(2) applies as well. Section 1B1.3(a)(2) provides that, "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction" qualify as relevant conduct.

Offenses are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." USSG § 1B1.3, Application Note 5(B)(ii). Factors that may be considered include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* Offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." USSG § 1B1.3, Application Note 5(B)(i).

11

The Seventh Circuit has repeatedly warned that the *kind* of offense cannot be the basis for a judgment that one offense is relevant conduct for another. *United States v. Bryant*, 557 F.3d 489, 503 (7th Cir. 2009) (noting "the name of the offense to which a defendant pleaded guilty" cannot form basis of relevant conduct determination); *United States v. Johnson*, 324 F.3d 875, 879 (7th Cir. 2003) ("[T]he relevant conduct guideline must not be read to encompass any offense that is similar in kind to the offense of conviction, but that does not bear the required relationship to that offense." (internal quotation marks omitted)); *United States v. Brooks*, 114 F.3d 106, 107 (7th Cir. 1997) (finding second drug deal not to be relevant conduct despite being "the same sort of conduct charged in the indictment in this case."). Two wire fraud offenses or two drug offenses are not relevant conduct with one another simply because they are the same type of crime. *See Johnson*, 324 F.3d at 880 (declining to treat other drug transactions as relevant conduct in drug prosecution).

Instead of treating all violations of the same statute the same, courts must look to "the identity of the participants and their roles in the events at issue, as well as the nature, structure and location of the allegedly related transactions." *Id.* at 879 citing *United States v. Cedano-Rojas*, 990 F.2d 1175, 1180 (7th Cir. 1993). If a defendant has partners for one offense and does not for another, that weighs against considering the offenses to be relevant conduct for each other. *See Brooks*, 114 F.3d at 108 (finding that two drug deals were "two distinct offenses" in part

12

because one case "involved folks . . . who were not connected in any way with the [other case].").

The PSR and the Government's Version of the Offense lay out defendant's conduct in this case and describe the impacted victims. Those victims and the scheme that ensnared them come comfortably under the Guidelines' definition of relevant conduct.[5] The Milwaukee case, in contrast, is unrelated to the victims in this case, and represents a different scheme that cannot be considered relevant conduct to the present case.

In fact, the Milwaukee case shares none of the features that connect the victims in the current case. The current case involves victims interlinked by overlapping lies, overlapping companies, Ponzi payments between victims, and a central fraud involving defendant convincing them that he was a legitimate consultant/financial adviser. The core fraud of the Milwaukee case was different; the victims in the Milwaukee case were duped into contributing money to defendant so defendant could open and operate a frozen yogurt company.[6] Notably, the frozen yogurt company played no role in any of the conduct in the current case. The victims had no connections to the victims in this case. Unlike in the present case, defendant did have an accomplice, his supposed business partner D.M. Defendant also involved a builder, R.S., in the scheme, having R.S. meet with the two Milwaukee victims. The location of the Milwaukee scheme was different. The

---

[5] Defendant does not contest that the fraud against the victims in this case constitutes relevant conduct. R. 114, p. 5.
[6] The plea agreement in the Milwaukee case includes on pages 15 and 16 a description of defendant's conduct in that case. It is attached as Attachment A to this memo.

victims in the present case were located in Illinois and California. The Milwaukee victims were, of course, in Wisconsin.

Any reasonable assessment of the relevant conduct factors laid out in USSG § 1B1.3 and related application notes ends on the conclusion that the Milwaukee case was a separate scheme. The only common plan or scheme factor that matches is the purpose—the conduct in both the Milwaukee case and this one was designed to steal people's money—but all instances of wire fraud have that basic purpose. As noted, the Seventh Circuit has explicitly ruled out considering offenses to be relevant conduct simply because they are the same type of crime. *United States v. Bryant*, 557 F.3d 489, 503 (7th Cir. 2009); *United States v. Johnson*, 324 F.3d 875, 879 (7th Cir. 2003); *United States v. Brooks*, 114 F.3d 106, 107 (7th Cir. 1997).

Neither could the Milwaukee scheme and the present one be considered the same course of conduct. The Milwaukee scheme lacks similarity with the conduct in this case, and this lack of similarity is the most useful factor for determining course of conduct. Many of the cases in the Seventh Circuit dealing with relevant conduct in the context of whether a prior offense can be considered a prior sentence are drug cases. In those circumstances, with conduct that is almost always very similar, regularity and the interval between offenses are often determinative. Here, the schemes' dissimilarity looms largest, despite the fact the conduct in this case occurred before, after, and while the Milwaukee case was playing out.

It is also worth considering defendant's objection in light of the purpose of USSG § 4A1.2, App. Note 1: to avoid double counting. *United States v. Nance*, 611

14

F.3d 409, 413 (7th Cir. 2010) ("[W]hen calculating a defendant's criminal history, a district court ordinarily cannot consider previous sentences for acts that qualify as relevant conduct. The reason for this prohibition is to avoid double counting and ensure consistency with other guideline provisions." (citation and internal quotation marks omitted)). The government is not seeking to include the Milwaukee scheme in relevant conduct because it is a different scheme for which he has already been convicted and sentenced. This straightforward conception of defendant's conduct does not harm him through double counting, as including the Milwaukee case both in criminal history and relevant conduct would.

## III.   FACTORS UNDER 18 U.S.C. § 3553(a)

The factors articulated in 18 U.S.C. 3553(a) weigh in favor of a Guidelines sentence.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense are those of a prolific fraudster who abused the trust of family, close friends, and clients to fund a lavish lifestyle, continue his scheme, and avoid responsibility for his wrongdoing. Defendant stole over $1.5 million in victim funds. One victim lost over $500,000, and six lost over $100,000. His actions led to financial hardship, emotional devastation, and the death of a young woman. Defendant attempts to put forth a different narrative of his crimes: he was trying his best, "had a habit of saying what people want to hear," and was earnestly attempting to do what was best for those that invested with him. R. 114, p. 2. This narrative is wrong. It is contradicted by conduct over a period of

15

almost ten years, including his specific and prolific lying to accomplish his fraud, his flirtations with obstruction in this case, and his manipulation of individuals and the justice system for his own benefit. Ultimately, defendant's framing of his own conduct is just one more tactic in a longstanding string of actions minimizing his own wrongdoing.

The Government's Version goes through defendant's lies, and the Court has been provided with numerous letters from victims describing the fallout from those lies. Defendant's career as a consultant and financial advisor was an ongoing ruse, not a good-faith enterprise with a few lies here and there. Wu was a professional fraudster, not a professional businessman. He provided fraudulent business summaries, and lied consistently about both companies he was supposedly helping or investing in and his own consulting/advising business. At one point he obtained money from Victims 11 and 12 that he said was secured by a condominium. Except the condo did not exist. At another point, he convinced those same victims to transfer funds out of a retirement account so that they could invest them in an equity investment fund through defendant. Defendant did not invest the funds as he had promised, and then convinced Victims 11 and 12 to invest additional money because the investment fund had a capital call.

In his objections to the PSR, defendant conceded that "Mr. Wu may have made false statements to people he owed money to, but if a false 'I will pay you next week' necessarily constitutes wire fraud, then the federal fraud statutes are applicable to a lot of people." R. 96, p. 10–11. This is not an apt comparison. Wu

16

was not lying about payment deadlines. He was telling elaborate, specific lies designed to get victims to give him money that he had no intention of using as he promised them he would.

When defendant did use client funds for purposes related to client companies, he blatantly skimmed money off the payments, as when he told Victims 2, 3, and 7 that a $3,000 expenditure cost $12,000. This is not a man who was just trying to do what was best for his clients. He was stealing money at every opportunity. In 2016, he used victim social security numbers to get credit cards without their permission. At one point he had an ex-girlfriend impersonate his own sister and use her social security number to make his sister a guarantor for corporate expenses without her knowledge. These are not the actions of a businessman who is just a little behind on things.

Nevertheless, defendant maintains that he was merely following the "fake it until you make it" credo, charitably admitting that this "is not acceptable when one is entrusted with other people's money." R. 114, pp. 8 and 9. But defendant did not squander his victims' money or manage it badly. He stole it. In what is presumably a novel euphemism for Ponzi payments, defendant suggests that he just "moved around money to try to make everything work." R. 114, p. 3. This characterization of his conduct betrays a central flaw in defendant's narrative. Defendant attempts to convince the Court that his efforts to operate and maintain his scheme and his lifestyle are somehow indicative of his good faith efforts on behalf of his victims.

17

Really they were used to perpetuate his scheme by giving the appearance of success, and to allow him to enjoy other people's money and the cache it could buy him.

The most galling example of this comes in a footnote lamenting that Wu did not keep better "business" records. He argues that his lifestyle of luxury hotels, casinos, and expensive entertainment was actually in the interests of the people that he stole from, because he was "travelling to businesses and conferences and networking with people in the relevant industries." R. 114, p. 9. Defendant claims that his networking was supposed to amount to profit for the people he stole from. In reality, defendant's lifestyle and the representations he made about it aided his scheme by convincing victims to give him money. Federal law does not allow a defendant to deduct expenses for his fraudulent scheme.

The nature and circumstances of the offense extend to defendant's attempts to conceal the scheme and to avoid accountability once the FBI came knocking. The most obvious acts of concealment were the lies he told to avoid his victims learning that he was headed to prison for a separate fraud scheme. His Ponzi payments also fall into this category. But defendant also attempted to persuade victims not to talk to authorities, telling his parents, his sister, and Victim 11 not to talk to the FBI after he learned that he was under investigation. While the government is not asking for an obstruction of justice enhancement to defendant's Guidelines range, the Court can and should take this conduct into consideration as part of the nature and circumstances of the offense.

Similarly, the government is not seeking a leadership enhancement for defendant's use of his girlfriend Victim 13 in this offense. But his apparent manipulation of Victim 13 adds a tragic element to his crime. Whatever her reasons for helping him, Victim 13 lied to victims on his behalf, and (perhaps unwittingly) helped him bilk her own family out of large sums of money. After defendant's arrest in this case, and with the full scope of his scheming coming into view, Victim 13 took her own life.

Defendant, no doubt realizing the obvious conclusion that his girlfriend took her own life because of his criminality, told Pretrial Services that Victim 13 had previously exhibited signs of depression and suicidal thoughts. The government is not in a position to say if this is true or an attempt by defendant to paint a misleading portrait of the departed in an effort to minimize his own culpability in her death.

In addition to using Victim 13, defendant targeted family and friends in his scheme. Victim 8 considered defendant to be one of his best friends. Defendant used that relationship to defraud Victim 8, and then lied to Victim 8 about his prison sentence in the Milwaukee case. Rather than tell the lie he had told others— that he was travelling for business—defendant concocted a fake cancer diagnosis. His devastated friend did not think twice about posting bond for defendant when he was arrested in this case. Victim 8 later learned the truth—that defendant had never had cancer and had in fact stolen money from him. Undeterred, defendant

tried to steal an additional $250,000 of Victim 8's money by attempting to empty an investment account that Victim 8 had opened on his own.

Defendant's brother-in-law provided probably the best summary of defendant's conduct when he described his "rampant deceit." Defendant claims that the fact that he targeted friends and family is evidence that he did not "have any plans to take anyone's money and then disappear." R. 114, p. 8. There are many reasons fraudsters target family, the most obvious being that those are the victims most likely to be sympathetic to the fraudster, to believe the fraudster's lies and to give money to the fraudster. As to disappearing, defendant's conduct indicates that he was not trying to steal people's money and run away; he was trying to steal people's money for as long as his scheme could last.

## B. History and Characteristics

The most salient aspect of defendant's history and characteristics is his conduct in the Milwaukee case and his lying to the Court in that case. Defendant was arrested for wire fraud in the Milwaukee case in May 2015. He pled guilty in April 2016, and was sentenced to a year and a day incarceration in December 2016. He was also sentenced to a three-year term of supervised release, which he was serving when he continued the fraud in the current case, including by sending emails to further the scheme while he was at the halfway house.

Defendant's conduct related to the Milwaukee case solidifies a characteristic of untruthfulness that was already apparent from the offense conduct in this case. In addition to the lies about the frozen yogurt company that led to his conviction in

20

the Milwaukee case, defendant also lied throughout the proceedings in that case. He lied in a financial statement in that case. He lied to probation in that case. And he lied to the court at sentencing.

The Milwaukee court expressed doubt that Wu truly accepted responsibility for his actions. That skepticism was based on defendant's strange allocution, in which he talked in circles, tried to shift responsibility, and only obliquely admitted to wrongdoing. R. 95, p. 63, n. 15. Defendant now claims that he knows what he did was wrong. R. 114, p. 3. He did plead guilty, and the government is not objecting to him receiving a Guidelines benefit for accepting responsibility. But his statement of facts in his plea and all of his pleadings since do not fully own up to what he did. He consistently elides the crucial character of his conduct.

Defendant says that his childhood desire to please his parents morphed into a habit of telling people what they wanted to hear. R. 114, p. 14. This just does not line up with his behavior. Defendant did more than tell people what they wanted to hear. He also took their money. Furthermore, many individuals are people-pleasers without resorting to defrauding friends and family out of $1.5 million.

## C. Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment

This is a very serious financial crime, with all the hallmarks of such cases. Victims lost large sums of money—money that had been painstakingly saved and was meant to last victims through retirement. Businesses and dreams were ruined. Victims had to change their life plans and cope with financial loss. But the human toll of this case distinguishes it even from other serious fraud cases. The most

21

tragic aspect of this is of course the death of Victim 13. The inarticulable pain of that loss can be felt in the letters from family members that the Court has had the opportunity to review.

Defendant's other victims were also emotionally traumatized by this crime, and defendant displayed far more cruelty than the typical fraudster. The emotional torment he put Victim 8 through was extreme: convincing him that his good friend was dying, then that he had recovered, only for him to find out that defendant never had cancer and had been bilking him the whole time. Victim 8 was not alone in feeling used by a friend. Victim 4 wrote: "I felt betrayed that Mr. Wu befriended me just to defraud me. Worse yet, he was manipulating people by appealing to our humanitarian side." Victim 1 developed severe daily anxiety caused by the loss of her money and that of friends and family. Victims 5 and 6 felt "true friendship and trust" towards defendant, only to be betrayed.

Defendant's demonstrated lack of respect for the law increases the need for a substantial sentence. His sentence in the Milwaukee case clearly did not engender that respect, and he felt comfortable lying to the Court in that case and in continuing to violate federal law. The Court should also consider the Milwaukee case in terms of the need to provide just punishment in this case. Defendants conduct in that case, and the fact that he continued to commit fraud even while on supervised release, are major factors necessitating a severe sentence. To instead deduct that time from any sentence in this case would not provide just punishment.

22

**D. Deterrence**

General deterrence is sometimes a greater concern in fraud cases than specific deterrence. That is especially true in cases like this one, where an individual acting as a financial adviser defrauds his clients. Indeed, given the position of trust that financial advisers hold and the large impact they can have on their clients when they engage in fraud, a substantial sentence is necessary in this case to deter other financial advisers from engaging in the type of conduct that defendant has. But what really stands out in this case is the need for specific deterrence.

Often unfamiliar with the criminal justice system prior to a first offense, white collar defendants are often thought to be specifically deterred by one time in federal custody. This case is an exception to that rule of thumb. Defendant's brazen conduct in continuing to commit fraud from the halfway house following his first stint in federal prison makes the need for specific deterrence in this case stark. A Guidelines sentence would both send a strong message to other would-be fraudsters, and more importantly would hopefully get through to defendant in a way his first sentence did not.

**IV.    CONCLUSION**

Based on his criminal history, the Guidelines recommend a term of imprisonment in the range of 108 to 135 months. Defendant can identify no viable basis for a departure from the Guidelines nor grounds for a variance under the factors listed in 18 U.S.C. § 3553(a). Conversely, the 18 U.S.C. § 3553(a) factors

place upward pressure on the sentence and justify a Guidelines sentence in this case.

For the reasons stated above and in the PSR and the Government's Version of the Offense, the United States respectfully recommends that the Court accept the facts and calculations of the PSR and sentence defendant to a term of imprisonment within the Guidelines range.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By:     */s/Paul Schied*
PAUL SCHIED
Assistant United States Attorney
219 South Dearborn, Room 500
Chicago, Illinois 60604
(312) 697-4091

Dated: January 21, 2022